UNITED STATES v. OREGON & C. R. CO. et al. (TERRACE et al., Interveners).

(Circuit Court, D. Oregon. April 24, 1911.)

No. 3,340.

1. PUBLIC LANDS (§ 71*)—RAILROAD GRANT—CONSTRUCTION.

By Act July 25, 1866, c. 242, 14 Stat. 239, Congress made a grant of lands in Oregon and California in aid of the construction of a railroad and telegraph line from the Central Pacific Railroad in California to Portland in Oregon. the company entitled to such lands in Oregon to be such one, organized under the laws of the state, as should be designated by the Legislature and should file its assent to the conditions of the act within one year after its passage, and thereafter complete a specified section of its road each year and the whole, from Portland to the state line, by a time fixed. The act provided that, if a company should fail to comply with its conditions by filing its assent, etc., the act should be null and void, and also reserved the right of Congress, having due regard to the rights of the companies, at any time to alter, amend, or repeal it. In 1868 it was amended (Act June 25, 1868, c. 80, 15 Stat. 80) by extending the time for commencement and completion of the several sections of the road. and by Act April 10, 1869, c. 27, 16 Stat. 47, a further amendment was enacted which allowed any company theretofore designated by the Legislature of Oregon to file its assent within a year thereafter, with a proviso "that the lands granted by the act aforesaid shall be sold to actual settlers only, in quantities not greater than one quarter section to one purchaser and for a price not exceeding $2.50 per acre." The Oregon Central Railroad Company was organized in 1867, was designated by the Legislature of the state to receive the grant in 1868, and in June, 1869, adopted a resolution assenting to the terms of the act with its amendments. which it filed in the Interior Department. It proceeded with the construction of its road, receiving patents for the lands granted coterminous with its completed sections in accordance with the act. *Held,*

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

that the grant was not in præsenti, there being no grantee in existence or qualified to take at the time the act was passed: that the company acquired no rights or equities under the act until the filing of its assent by which its rights and its relation to the grant were initiated; and that it took the lands subsequently earned subject to the proviso contained in the amendment of April 10, 1869, by virtue of which amendment alone it was permitted to come into such relation after the time fixed by the original act had expired.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 232; Dec. Dig. § 71.*]

2. PUBLIC LANDS (§§ 85, 117*)—RAILROAD GRANTS—CONDITIONS—EFFECT OF ACTION OF LAND DEPARTMENT.

It is within the jurisdiction of the Land Department, before issuing patents to public lands to a railroad company under a grant, to determine whether all the conditions to entitle the company to such patents have been complied with, and its determination of all matters of fact is conclusive and not subject to collateral attack; but it is not within its province to determine whether conditions subsequent imposed in the grant have been fulfilled, and its issuance of patents from time to time as sections of the road were completed, even after such conditions subsequent had been violated as to lands previously patented. was not a waiver by the government of the right to insist on such conditions nor an adjudication that they had been complied with.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 259, 324; Dec. Dig. §§ 85, 117.*

Decisions of Land Department—their conclusiveness and effect, see notes to Hartman v. Warren, 22 C. C. A. 38; Carson City Gold & Silver Mining Co. v. North Star Mining Co., 28 C. C. A. 344; Unita Tunnel Mining & Transportation Co. v. Creede & Cripple Creek Min. & Mill. Co., 57 C. C. A. 207.]

3. PUBLIC LANDS (§ 85*)—RAILROAD GRANTS—WAIVER OF CONDITIONS—"SALE."

A condition in a grant of lands to a railroad company, that they should be sold only to actual settlers with a limitation as to quantity and price. was not waived by the government by its acquiescence in a transfer of the entire grant to a corporation organized to succeed to all the property, rights, and franchises of the original grantee, which was not a sale within the meaning of the condition, but merely a substitution of grantees; the land still remaining subject to the condition in the hands of the transferee.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 259; Dec. Dig. § 85.*

For other definitions, see Words and Phrases, vol. 7, pp. 6291–6306; vol. 8, p. 7793.]

4. PUBLIC LANDS (§ 88*)—RAILROAD GRANTS—WAIVER OF CONDITIONS.

A breach of a condition in a grant of lands to a railroad company that the land should be sold only to actual settlers, in limited quantities, and at a fixed price, was not waived by the government because it remained silent when sales were made, in violation of such condition, where there was no action to mislead the grantee or create an estoppel.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 266–268; Dec. Dig. § 88.*]

5. PUBLIC LANDS (§ 88*)—RAILROAD GRANTS—WAIVER OF CONDITIONS—ACTION OF EXECUTIVE OFFICERS.

Executive officers of the United States cannot, without express authority from Congress, waive conditions imposed by Congress in a grant of lands to a railroad company.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 266–268; Dec. Dig. § 88.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**6. PUBLIC LANDS (§ 88*)—RAILROAD GRANT—WAIVER OF CONDITIONS.**

Where an act granting, lands to a railroad company gave the government the right to use the road for certain purposes, and also imposed conditions on the sale of the lands by the grantee, the acceptance and use of the road by the government, even after the violation of such condition, was not a waiver thereof.

[Ed. Note.—For other cases. see Public Lands, Cent. Dig. §§ 266–268; Dec. Dig. § 88.*]

**7. UNITED STATES (§ 133*)—RIGHT OF ACTION—LACHES.**

Laches is not imputable to the United States.

[Ed. Note.—For other cases, see United States, Cent. Dig. §§ 127, 128; Dec. Dig. § 133.*]

**8. PUBLIC LANDS (§ 88*)—RAILROAD GRANTS—CONDITIONS.**

Act Sept. 29, 1890, c. 1040, 26 Stat. 496 (U. S. Comp. St. 1901, p. 1598), declaring forfeited all lands theretofore granted in aid of the construction of any railroad opposite to and coterminous with the portion of such road not then completed and in operation, did not operate to confirm the title of the companies to lands opposite completed portions of their roads against all contingencies and reserved conditions whether precedent or subsequent, nor as a waiver of forfeiture for condition broken.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 266–268; Dec. Dig. § 88.*]

**9. PUBLIC LANDS (§ 88*)—RAILROAD GRANTS—SUIT FOR FORFEITURE—LIMITATION.**

Act March 3, 1891, c. 561, § 8, 26 Stat. 1099 (U. S. Comp. St. 1901, p. 1521), and Act March 2, 1896, c. 39, § 1, 29 Stat. 42 (U. S. Comp. St. 1901, p. 1603), which together limit the time for the bringing of suits by the United States for the cancellation of patents to lands, whether issued under a railroad grant or otherwise, to a stated time after the issuance of such patents, do not apply to a suit to enforce a forfeiture of an entire railroad grant, so far as the land is still held by the grantee, for breach of a condition requiring the grantee to sell only to actual settlers, which may have occurred after the patents were issued.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 266–268; Dec. Dig. § 88.*]

**10. PUBLIC LANDS (§ 42*)—CONSTRUCTION—LEGISLATIVE GRANTS OF LAND.**

In the case of legislative grants of public lands, imposing conditions along therewith upon the grantee in relation to the thing granted, the acts conferring them are to be construed as laws, and the technical rules governing the interpreting of contracts are inapplicable; the single inquiry being as to the intent of the one party—the legislative intendment in promulgating the law.

[Ed. Note.—For other cases, see Public Lands, Dec. Dig. § 42.*]

**11. PUBLIC LANDS (§ 42*)—CONSTRUCTION—LEGISLATIVE GRANTS OF LAND.**

If there is ambiguity or uncertainty in an act granting public lands to private individuals or corporations, it should be construed most favorably to the government.

[Ed. Note.—For other cases, see Public Lands, Dec. Dig. § 42.*]

**12. TRUSTS (§ 21*)—LAW CREATING TRUST—CERTAINTY AS TO BENEFICIARIES AND INTERESTS.**

An act granting lands to a railroad company, with a proviso that they shall be sold to actual settlers only in quantities not greater than one quarter section to one purchaser and for a price not exceeding $2.50 per acre, does not create a trust in the company in favor of persons who may settle on the land, which they can enforce, as such a trust would be void for uncertainty both as to the beneficiaries and their interest, since both the quantity and price specified in the act are maximum, leaving it dis-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

cretionary with the company to sell a less quantity to one purchaser or to make a lower price.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 29, 30; Dec. Dig. § 21.*]

13. PUBLIC LANDS (§ 85*)—RAILROAD GRANT—CONSTRUCTION AND OPERATION.

An act granting lands to a railroad company, with a proviso that they shall be sold to actual settlers only, in quantities not greater than one quarter section to one purchaser and for a price not exceeding $2.50 per acre, does not create a contract with a third person to sell him a particular tract of land on his declaring his purpose to become a settler thereon or making actual settlement and tendering the purchase price to the company, in the absence of any such offer by the company, since the act makes no such offer on behalf of the government, but transfers title to the land to the company, which may or may not sell in a particular instance, in its discretion.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 259; Dec. Dig. § 85.*]

14. PUBLIC LANDS (§ 85*)—RAILROAD GRANT—CONSTRUCTION—CONDITION SUBSEQUENT.

In reviving a grant of lands to aid in the construction of a railroad in Oregon, in 1869, after it had lapsed by reason of the failure of any company to file its assent and acceptance within the time prescribed by the original act, Congress added a clause, "And provided further that the lands granted by the act aforesaid shall be sold to actual settlers only, in quantities not greater than one quarter section to one purchaser, and for a price not exceeding two dollars and fifty cents per acre." *Held*, that such proviso was not a covenant, but, construing it in the light of the then settled policy of Congress to preserve all public lands for the use of actual settlers, while at the same time it was the design to assist the construction of the road, it imposed on the grant a condition subsequent for a breach of which on the part of the grantee company the lands were subject to forfeiture to the United States.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 259; Dec. Dig. § 85.*]

15. PUBLIC LANDS (§ 90*) — RAILROAD GRANT — CONDITION SUBSEQUENT — RIGHTS OF MORTGAGEE.

Under such construction of the grant, a mortgage of the lands, in their entirety, would be subject to the condition subsequent.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 273; Dec. Dig. § 90.*]

16. PUBLIC LANDS (§ 85*) — RAILROAD GRANT — CONSTRUCTION — CONDITIONS SUBSEQUENT.

By Act May 4, 1870, c. 69, 16 Stat. 94, Congress made a grant of lands to the Oregon Central Railroad Company to aid in the construction of its road, the act providing that the lands should be sold to actual settlers only in quantities not greater than one quarter section to any one settler and at prices not exceeding $2.50 per acre. It further provided that the company should by mortgage or deed of trust to trustees set apart all of the net proceeds of the sales as a sinking fund to be used in the purchase and redemption of its bonds therein described, and that no part of such fund should be used for any other purpose until all of the bonds had been purchased or redeemed. *Held*, that such provisions were not merely regulative covenants, not enforceable, but to be observed or not in the discretion of the company, but conditions subsequent, for a violation of which the grant was forfeitable to the United States.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 259; Dec. Dig. § 85.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

17. EQUITY (§ 24*)—JURISDICTION—ENFORCEMENT OF FORFEITURE.

The general rule that a court of equity will not enforce a forfeiture is not inflexible, and it may do so where the forfeiture is consonant with right and justice, and especially where it is for breach of condition of a public grant to a private person or corporation.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 69-76; Dec. Dig. § 24.*]

18. PUBLIC LANDS (§ 88*)—SUIT TO ENFORCE FORFEITURE OF GRANT—JURISDICTION OF EQUITY.

By Act July 25, 1866, c. 242, 14 Stat. 239 (as amended by Act June 25, 1868, c. 80, 15 Stat. 80, and Act April 10, 1869, c. 27, 16 Stat. 47), and Act May 4, 1870, c. 69, 16 Stat. 94, Congress made grants of lands to two railroad companies in Oregon annexing certain conditions to each grant. April 30, 1908, Congress by a joint resolution (No. 18, 35 Stat. 571) authorized and directed the Attorney General to institute and prosecute any and all suits in equity, actions at law, and other proceedings which he might deem adequate and appropriate to enforce the rights and remedies of the United States arising or growing out of such grants, in which suits he should, in such manner as he should deem appropriate, assert all rights and remedies existing in favor of the United States, "including the claim on behalf of the United States that the lands granted by each of said acts respectively or any part thereof have been and are forfeited to the United States by reason of any breaches or violations of any of the terms or conditions of either or any of said acts, which may be alleged and established in any such suits, actions or proceedings; it not being intended hereby to determine the right of the United States to any such forfeiture, * * * but it being intended to fully authorize * * * the court or courts before which such suits * * * may be instituted or pending to entertain, consider and adjudicate the claim and right of the United States to such forfeiture, and if found to enforce the same." Held, that a federal court of equity had jurisdiction to entertain and determine such a suit, brought to cancel patents issued under such grants, and to quiet the title of the United States to the lands embraced therein, although it involved a forfeiture of the grants; the lands being wild and unimproved and not in the actual possession of defendants.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 266-268; Dec. Dig. § 88.*

Jurisdiction of federal courts in suits under public land laws, see note to Bailey v. Mosher, 11 C. C. A. 314.]

In Equity. Suit by the United States of America, complainant, against the Oregon & California Railroad Company, Southern Pacific Company, Stephen T. Gage (individually and as trustee), Union Trust Company (individually and as trustee), John L. Snyder, Julius F. Prahl, Albert E. Thompson, James Barr, Fred Witte, W. A. Anderson, W. H. Anderson, O. M. Anderson, F. E. Williams, Paul Birkenfeld, J. H. Lewis, Francis S. Wiser, W. E. Anderson, Albert Arms, Joseph A. Maxwell, Isaac McKay, J. R. Peterson, D. MacLafferty, Edgar MacLafferty, V. V. McAboy, George C. MacLafferty, George Edgar MacLafferty, E. L. MacLafferty, B. N. MacLafferty, Enos M. Fluhrer, F. W. Floeter, S. Shryock, Sidney Ben Smith, Orrin J. Lawrence, Robert G. Balderree, Oscar E. Smith, Egbert C. Lake, C. W. Sloat, Jesse F. Holbrook, A. E. Haudenschield, S. H. Montgomery, W. A. Noland, John H. Haggett, Charles W. Mead, William Otterstrom, Angus MacDonald, John T. Moan, Joseph D. Hadley, Henry C. Ott, Fred L. Freebing, William Cain, R. T. Aldrich, James C.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

O'Neill, Alexander Fauske, Francis Wiest, Cordelia Michael, John B. Wiest, Cyrus Wiest, John Wiest, Thomas Manley Hill, Otto Nelson, Jasper L. Hewitt, B. L. Porter, Frank Wells, C. P. Wells, I. H. Ingram, L. G. Reeves, W. W. Wells, F. M. Rhoades, Marvin Martin, and Roy W. Minkler, defendants; John L. Snyder and others, cross-complainants; and Frank Torrace and others, interveners. On demurrers to bill, cross-bill, and bills of intervention. Demurrer to bill overruled. Demurrer to cross-bill and bills of intervention sustained.

After setting out the citizenship and residence of the respective parties, the bill of complaint states, in effect:

On July 25, 1866, Congress passed an act (Act July 25, 1866, c. 242, 14 Stat. 239) granting lands in aid of the construction of a railroad and telegraph line from the Central Pacific Railroad, in California, to Portland, in Oregon. By its first section the act authorizes and empowers the California & Oregon Railroad Company, and such company organized under the laws of the state of Oregon as the Legislature thereof shall thereafter designate, to construct and maintain a railroad and telegraph line between the city of Portland, in Oregon, and the Central Pacific Railroad, in California.

Thereafter it is provided as follows:

Sec. 2. "That there be, and hereby is, granted to the said companies, their successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores over the line of said railroad, every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile (ten on each side) of said railroad line; and when any of said alternate sections or parts of sections shall be found to have been granted, sold, reserved, occupied by homestead settlers, pre-empted, or otherwise disposed of, other lands, designated as aforesaid, shall be selected by said companies in lieu thereof, under the direction of the Secretary of the Interior in alternate sections designated by odd numbers as aforesaid, nearest to and not more than ten miles beyond the limits of said first-named, alternate sections; and as soon as the said companies, or either of them, shall file in the office of the Secretary of the Interior a map of the survey of said railroad, or any portion thereof, not less than sixty continuous miles from either terminus, the Secretary of the Interior shall withdraw from sale public lands herein granted on each side of said railroad, so far as located and within the limits before specified. The lands herein granted shall be applied to the building of said road within the states, respectively, wherein they are situated. And the sections and parts of sections of land which shall remain in the United States within the limits of the aforesaid grant shall not be sold for less than double the minimum price of public lands when sold: Provided, that bona fide and actual settlers under the pre-emption laws of the United States may, after due proof of settlement, improvement, and occupation, as now provided by law, purchase the same at the price fixed for said lands at the date of such settlement, improvement, and occupation: And provided, also, that settlers under the provisions of the homestead act, who comply with the terms and requirements of said act, shall be entitled, within the limits of said grant, to patents for an amount not exceeding eighty acres of the land so reserved by the United States, anything in this act to the contrary notwithstanding."

Sec. 3. "That the right of way through the public lands be, and the same is hereby, granted to said companies for the construction of said railroad and telegraph line; and the right, power, and authority are hereby given to said companies to take from the public lands adjacent to the line of said road, earth, stone, timber, water, and other materials for the construction thereof. Said right of way is granted to said railroad to the extent of one hundred feet in width on each side of said railroad where it may pass over the public lands, including all necessary grounds for stations, buildings, workshops, depots, machine shops, switches, side tracks, turntables, water stations, or any other structures required in the construction and operating of said road."

Sec. 4. That, whenever 20 or more consecutive miles of the road shall have been completed and ready for use, the same shall be examined by three commissioners appointed by the President, who are required to report to the President; and, if it shall appear that the line of road and telegraph has been constructed and equipped in accordance with the terms of the act, then that patents shall issue to the company entitled to the same for the lands granted to the extent and coterminous with the completed section, and thus from time to time, whenever other sections of the road shall be completed, until the entire line shall have been constructed.

Sec. 5. "That the grants aforesaid are made upon the condition that the said companies shall keep said railroad and telegraph in repair and use, and shall at all times transport the mails upon said railroad, and transmit dispatches by said telegraph line for the government of the United States, when required so to do by any department thereof, and that the government shall at all times have the preference in the use of said railroad and telegraph therefor at fair and reasonable rates of compensation, not to exceed the rates paid by private parties for the same kind of service. And said railroad shall be and remain a public highway for the use of the government of the United States, free of all toll or other charges upon the transportation of the property or troops of the United States; and the same shall be transported over said road at the cost, charge, and expense of the corporations or companies owning or operating the same, when so required by the government of the United States."

Sec. 6. "That the said companies shall file their assent to this act in the Department of the Interior within one year after the passage hereof, and shall complete the first section of twenty miles of said railroad and telegraph within two years, and at least twenty miles in each year thereafter, and the whole on or before the first day of July, one thousand eight hundred and seventy-five; and the said railroad shall be of the same gauge as the 'Central Pacific Railroad' of California, and be connected therewith."

Sec. 7. "That the said companies named in this act are hereby required to operate and use the portions or parts of said railroad and telegraph mentioned in section one of this act for all purposes of transportation, travel, and communication, so far as the government and public are concerned, as one connected and continuous line: and in such operation and use to afford and secure to each other equal advantages and facilities as to rates, time, and transportation, without any discrimination whatever, on pain of forfeiting the full amount of damage sustained on account of such discrimination, to be sued for and recovered in any court of the United States, or of any state, of competent jurisdiction."

Sec. 8. "That in case the said companies shall fail to comply with the terms and conditions required, namely, by not filing their assent thereto as provided in section six of this act, or by not completing the same as provided in said section, this act shall be null and void, and all the lands not conveyed by patent to said company or companies, as the case may be, at the date of any such failure, shall revert to the United States. And in case the said road and telegraph line shall not be kept in repair and fit for use, after the same shall have been completed, Congress may pass an act to put the same in repair and use, and may direct the income of said railroad and telegraph line to be thereafter devoted to the United States, to repay all expenditures caused by the default and neglect of said companies or either of them, as the case may be, or may fix pecuniary responsibility, not exceeding the value of the lands granted by this act."

Sec. 9. That the companies concerned shall be governed by the general laws of the respective states as to the construction and management of said railroad and telegraph line in all matters not provided for in the act.

Sec. 10. That all mineral lands, except such as shall contain coal and iron, shall be excepted from the operation of the grant; but that, where such lands contain timber, so much of the timber as shall be required to construct the road over the lands is hereby granted.

Sec. 11. That said companies shall be governed by the statutory regulations of the states concerned in all matters pertaining to the right of way wherever said road shall not pass through public lands of the general government.

Sec. 12. "That Congress may at any time, having due regard for the rights of said California and Oregon railroad companies, add to, alter, amend, or repeal this act."

This act was amended June 25, 1868 (Act June 25, 1868, c. 80, 15 Stat. 80), whereby section 6 thereof was made to provide that: "Instead of the times now fixed in said section, the first section of twenty miles of said railroad and telegraph shall be completed within eighteen months from the passage of this act, and at least twenty miles in each two years thereafter, and the whole on or before the first day of July, anno domini eighteen hundred and eighty."

About October 6, 1866, certain persons attempted to organize a corporation bearing the name "Oregon Central Railroad Company," having its principal office at Portland, Or. This company projected its line of road from Portland to Forest Grove, thence to McMinnville, on the westerly side of the Willamette river. For convenience it will be hereafter referred to as the "West Side Company," and its line as the "West Side Line."

On October 10, 1866, the Legislative Assembly of the State of Oregon, by joint resolution, designated the Oregon Central Railroad Company as the organization entitled to receive the grant and benefits accorded by the act of Congress of July 25, 1866. This company, on May 25, 1867, assented to the provisions of said act of Congress, and thereafter, about July 6, 1867, filed an authenticated copy of its resolution, together with a certified copy of its articles of incorporation and of the joint resolution of the Legislative Assembly of Oregon, with the Secretary of the Interior, and on about the 20th of August, 1868, filed with such officer a general map of survey of its projected line of railroad.

In the meantime, namely, about April 22, 1867, certain persons, contending that said West Side Company was not regularly and lawfully incorporated, and designing to secure the grant and privileges accorded by said act of Congress of July 25, 1866, organized another corporation bearing the name "Oregon Central Railroad Company," having its principal place of business at the city of Salem, Or. This company projected its line of road on the easterly side of the Willamette river, and for convenience will be designated the "East Side Company," and its line the "East Side Line."

On October 20, 1868, the East Side Company procured a joint resolution to be adopted by the Legislative Assembly of the State of Oregon, whereby, after setting out, among other things, the adoption of the act of Congress of July 25, 1866, the adoption by the Legislature of the state of House Joint Resolution No. 13, designating the Oregon Central Railroad Company as the organization entitled to the benefits of the grant and privileges accorded by said act of Congress, that at the time of the adoption of such resolution no such company as the Oregon Central Railroad Company was organized or in existence, that the resolution was adopted under a misapprehension of the facts, and that the proper designation yet remained to be made, it was resolved that the Oregon Central Railroad Company, a corporation organized at Salem on April 22, 1867, "be and the same is hereby designated as the company entitled to receive the lands in Oregon, and the benefits and privileges conferred by the said act of Congress." Thereupon a controversy arose between the West Side Company and the East Side Company as to which was entitled to the benefits of the said act of Congress, and, the time within which to file an assent having expired long prior to the designation of the East Side Company by the Legislative Assembly of Oregon, the said East Side Company applied to Congress for an extension of time for filing its assent, following which the respective contentions of the East and the West Side Companies relative to the right to receive the benefits of the act of July 25, 1866, were placed before Congress, and that body, on April 10, 1869, passed an act amendatory of section 6 of the act of July 25, 1866, in language following:

"That section six * * * be, and the same is hereby, amended so as to allow any railroad company heretofore designated by the Legislature of the State of Oregon, in accordance with the first section of said act, to file its assent to such act in the Department of the Interior within one year from the date of the passage of this act; and such filing of its assent, if done

within one year from the passage hereof, shall have the same force and effect to all intents and purposes as if such assent had been filed within one year after the passage of said act: Provided, that nothing herein shall impair any rights heretofore acquired by any railroad company under said act, nor shall said act or this amendment be construed to entitle more than one company to a grant of land: And provided further, that the lands granted by the act aforesaid shall be sold to actual settlers only, in quantities not greater than one-quarter section to one purchaser, and for a price not exceeding two dollars and fifty cents per acre." Act, April 10, 1869, c. 27, 16 Stat. 47.

On June 8, 1869, the East Side Company adopted a resolution assenting to the terms of the act of July 25, 1866, an authenticated copy of which was filed in the office of the Secretary of the Interior on June 13, 1869. This resolution by its preamble set forth, among other things, that no company was designated within the year within which an assent was required to be filed to the act of July 25, 1866, and that Congress did, on April 10, 1869, pass an act extending the time in which assent might be filed. About October 29, 1869, the East Side Company filed in the office of the Secretary of the Interior a map of survey and location of the first 60 miles of its projected line of railroad; and on December 24th of the same year completed the construction of the first 20 miles of road, from Portland south, which was approved December 31st by commissioners duly appointed.

The West Side Company wholly failed to construct any part of its projected line of road, and abandoned and waived all claim to the benefits to accrue under said acts of Congress, and in lieu thereof applied for and obtained and accepted a similar grant of lands, franchises, and other benefits pertaining to its projected line of road by act of Congress approved May 4, 1870 (Act May 4, 1870, c. 69, 16 Stat. 94).

The East Side Company having become involved in litigation questioning the validity of its organization, also its right to use the corporate name adopted, on March 17, 1870, its officers, stockholders, and promoters organized the Oregon & California Railroad Company; the principal purpose of this organization being to become the successor to said East Side Company, and to receive, hold, and exercise the grants, franchises, and privileges accorded by said act of Congress of July 25, 1866, and acts amendatory thereto. Pursuant to such purpose, the East Side Company, on March 29, 1870, executed and delivered to the Oregon & California Railroad Company a certain instrument of writing purporting to assign, transfer, and convey to the latter company all the property of the former, including all its right, title, and interest in and to the grants, franchises, and benefits under the act of July 25, 1866.

On April 4, 1870, the Oregon & California Railroad Company adopted a resolution, whereby the company accepted the grant conferred by the act of Congress of July 25, 1866, and acts amendatory thereof, and authorized its president and secretary to file such assent in the office of the Secretary of the Interior, together with an authenticated copy of the deed of assignment from the Oregon Central Railroad Company. A copy of the resolution and deed of assignment was filed with the Secretary of the Interior April 28, 1870; and from that time on the Oregon & California Railroad Company assumed and continued to act as the successor to the Oregon Central Railroad Company, being the said East Side Company.

On May 4, 1870, Congress passed an act granting certain lands to the Oregon Central Railroad Company—the West Side Company—to aid in the construction of a railroad and telegraph line from Portland to Astoria and McMinnville, in Oregon, which provides as follows:

"That for the purpose of aiding in the construction of a railroad and telegraph line from Portland to Astoria, and from a suitable point of junction near Forest Grove to the Yamhill river, near McMinnville, in the state of Oregon, there is hereby granted to the Oregon Central Railroad Company, now engaged in constructing the said road, and to their successors and assigns, the right of way through the public lands of the width of one hundred feet on each side of said road, and the right to take from the adjacent public lands materials for constructing said road, and also the necessary lands

for depots, stations, side tracks, and other needful uses in operating the road, not exceeding forty acres at any one place; and, also, each alternate section of the public lands, not mineral, excepting coal or iron lands, designated by odd numbers nearest to said road, to the amount of ten such alternate sections per mile, on each side thereof, not otherwise disposed of or reserved or held by valid pre-emption or homestead right at the time of the passage of this act. And in case the quantity of ten full sections per mile cannot be found on each side of said road, within the said limits of twenty miles, other lands designated as aforesaid shall be selected under the direction of the Secretary of the Interior on either side of any part of said road nearest to and not more than twenty-five miles from the track of said road to make up such deficiency."

Sec. 2. "That the Commissioner of the General Land Office shall cause the lands along the line of the said railroad to be surveyed with all convenient speed. And whenever and as often as the said company shall file with the Secretary of the Interior maps of the survey and location of twenty or more miles of said road, the said Secretary shall cause the said granted lands adjacent to and coterminous with such located sections of road to be segregated from the public lands; and thereafter the remaining public lands, subject to sale within the limits of the said grant, shall be disposed of only to actual settlers at double the minimum price for such lands: And provided also, that settlers under the provisions of the homestead act who comply with the terms and requirements of said act, shall be entitled, within the said limits of twenty miles, to patents for an amount not exceeding eighty acres each of the said ungranted lands, anything in this act to the contrary notwithstanding."

Sec. 3. "That whenever and as often as the said company shall complete and equip twenty or more consecutive miles of the said railroad and telegraph, the Secretary of the Interior shall cause the same to be examined, at the expense of the company, by three commissioners appointed by him; and if they shall report that such completed section is a first-class railroad and telegraph, properly equipped and ready for use, he shall cause patents to be issued to the company for so much of the said granted lands as shall be adjacent to and coterminous with the said completed sections."

Sec. 4. "That the said alternate sections of land granted by this act, excepting only such as are necessary for the company to reserve for depots, stations, side tracks, wood yards, standing ground, and other needful uses in operating the road, shall be sold by the company only to actual settlers, in quantities not exceeding one hundred and sixty acres or a quarter section to any one settler, and at prices not exceeding two dollars and fifty cents per acre."

Sec. 5. "That the said company shall, by mortgage or deed of trust to two or more trustees, appropriate and set apart all the net proceeds of the sales of the said granted lands, as a sinking fund, to be kept invested in the bonds of the United States, or other safe and more productive securities, for the purchase from time to time, and the redemption at maturity, of the first mortgage construction bonds of the company, on the road, depots, stations, side tracks, and wood yards, not exceeding thirty thousand dollars per mile of road, payable in gold coin not longer than thirty years from date, with interest payable semi-annually in coin not exceeding the rate of seven per centum per annum; and no part of the principal or interest of the said funds shall be applied to any other use until all the said bonds shall have been purchased or redeemed and cancelled; and each of the said first mortgage bonds shall bear the certificate of the trustees, setting forth the manner in which the same is secured and its payment provided for. And the District Court of the United States, concurrently with the state courts, shall have original jurisdiction, subject to appeal and writ of error, to enforce the provisions of this section."

Sec. 6. "That the said company shall file with the Secretary of the Interior its assent to this act within one year from the time of its passage; and the foregoing grant is upon condition that said company shall complete a section of twenty or more miles of said railroad and telegraph within two years, and the entire railroad and telegraph within six years, from the same date."

About July 2, 1870, the West Side Company, through its board of directors, adopted a resolution assenting to and accepting all the provisions of said act, and thereafter, on July 20th, filed an authenticated copy of such resolution in the office of the Secretary of the Interior. About August 15, 1870, all the capital stock of the West Side Company was acquired by the owners of the capital stock of the Oregon & California Railroad Company, and thereafter the capital stock of both companies was held as a single interest, and the affairs of the two companies were conducted as a single enterprise until the dissolution of the West Side Company.

With funds derived from mortgage bonds and otherwise, the East Side Line, up to the month of January, 1873, was constructed as far south as Roseburg, a distance of 197 miles from Portland, and said West Side Line to McMinnville, a distance of 47 miles. At that time the companies became insolvent, and the construction of the East Side Line was not resumed until in June, 1881, while the West Side Line was never resumed. Thereafter, from about July 24, 1874, the direction and control of the financial affairs of the two companies were assumed and exercised by the creditors thereof, organized under the name and designation "Bondholders' Committee," which committee subsequently acquired all the capital stock of said companies. About October 6, 1880, the Bondholders' Committee caused the West Side Company to execute and deliver to the Oregon & California Railroad Company a certain instrument in writing purporting to assign, transfer, and convey to the latter company all the property of the former, including all its right, title, and interest in and to the grant, franchises, and other benefits accruing in pursuance of the act of Congress of May 4, 1870. Ever since said date the Oregon & California Railroad Company has assumed to be the rightful successor to the said West Side Company.

For convenience, the respective grants by Congress will be alluded to as the "East Side grant" and the "West Side grant."

About May 7, 1881, through a readjustment of the capital stock of the Oregon & California Railroad Company by its board of directors and stockholders, all the former capital stock of said company was canceled, and a reissue was had, consisting of $12,000,000 preferred stock, and $7,000,000 common stock, aggregating $19,000,000. Through the issuance of this stock, and the use in part of the proceeds of a new bond issue, all of the company's existing indebtedness was then fully paid and discharged.

About June 2, 1881, the Oregon & California Railroad Company executed and delivered to Henry Villard, Robert Davie Peebles, and Charles Edward Brotherton, as trustees for the owners and holders of the said preferred stock, an instrument of writing purporting to convey to said trustees all lands comprised by both of said land grants, in trust, to secure to the owners of said preferred stock some asserted right or interest in or to said lands, and for certain other purposes more particularly specified in said instrument. Thereafter Stephen T. Gage succeeded to the trusteeship under said instrument, and is now the sole surviving trustee. He, by virtue thereof, and the Southern Pacific Company, by virtue of its ownership of the preferred stock, claim and assert some right, title, and interest in, or lien upon, the granted lands.

In June, 1881, and May, 1883, the Oregon & California Railroad Company issued first and second mortgage bonds aggregating, approximately, $5,000,000; the work of construction was resumed; and the East Side Line was extended to a point 1¼ miles south of Ashland, a distance of approximately 145 miles. This extension was completed about the month of January, 1884, and the work of extension was not again resumed until in April, 1887. In January, 1885, by reason of default in payment of said first and second mortgage bonds, the Oregon & California Railroad Company was placed in the hands of a receiver.

In connection with these facts, which are more fully set out in the bill of complaint, it is alleged that the West Side Company acquired no right or interest in or to the East Side grant, and that the said East Side Company acquired no right or interest therein except subject to all the terms and conditions of the act of Congress of April 10, 1869; that the principal purpose of the conveyance of date March 29, 1870, was not to operate as a sale or conveyance of any of the lands granted by said act of Congress of July 25,

1866, but was to constitute the Oregon & California Railroad Company the successor to the said East Side Company, to construct and equip said line of railroad, and to receive the grant and exercise the franchises and other benefits accorded by said act of Congress, the same allegation being made with reference to the conveyance by the West Side Company to the Oregon & California Railroad Company, of date October 6, 1880; that the original capital stock of the Oregon & California Railroad Company, and substantially all the stock of the West Side Company, were issued without consideration; that neither of said companies had any funds for construction or other purposes, except such as were borrowed therefor; and that the deed of trust to Villard and other trustees purports to convey and to authorize said trustees to sell and convey said lands comprised by the said East and West Side grants to other than actual settlers, in quantities greater than one quarter section to one person, and at a price greater than $2.50 per acre, and was therefore in violation and breach of the express terms of the grants. .

It is further alleged, in effect, as follows: About January, 1885, a certain railroad syndicate, known as the "Southern Pacific System," controlling substantially all the railroad lines in the southwestern part of the United States, including the Central Pacific Railroad, organized the Southern Pacific Company as a general holding company for said syndicate, and on or about March, 1885, the Southern Pacific Company acquired, and has since exercised, a controlling interest in each of the corporations constituting said Southern Pacific System, and is the lessee of all of the railroad lines controlled by said system, exercising control thereof, as well as control over, and the handling and disposal of, all the lands of its constituent companies. Shortly after the organization of the Southern Pacific Company, it established a land department in San Francisco, Cal., for the control, handling, and disposal of lands of its constituent companies held under grants from the government; and, after the Oregon & California Railroad Company passed into the hands of a receiver, the Southern Pacific Company, designing to acquire the ownership and control of its holdings, entered into negotiations with said company; and the bondholders and stockholders thereof, which resulted in a contract, of date March 28, 1887, the general effect being that the Oregon & California Railroad Company, together with its lines of railroad, was absorbed by, and merged into, the said Southern Pacific System; and the complainant charges that it was further the purpose and design of the Southern Pacific Company to secure control of the Oregon & California Railroad Company's land grants, and to divert the same from the purposes for which such grants were made to the exclusive use and benefit of the Southern Pacific Company. Thereafter the Oregon & California Railroad Company was continued a corporation in name only, and as an instrumentality and device for the administration of these grants.

About May 12, 1887, in pursuance of the contract of March 28, 1887, all of the capital stock, and all of said second mortgage bonds of the Oregon & California Railroad Company were assigned and transferred to the Pacific Improvement Company, and all of said first mortgage bonds were assigned and transferred to the Southern Pacific Company. The Pacific Improvement Company was a corporation controlled and directed by the owners of a majority of the capital stock of the Southern Pacific Company, and held the capital stock of the Oregon & California Railroad Company in trust for the use and benefit of the Southern Pacific Company until about April 9, 1901, when all of such capital stock was transferred to the Southern Pacific Company, which company is now the owner and holder thereof.

Pursuant, further, to the contract of March 28, 1887, the Southern Pacific Company and the Oregon & California Railroad Company entered into a contract of lease, in writing, whereby the railroad and telegraph lines of the latter company were leased to the former for the term of 40 years, which remained in full force and effect until about August 1, 1893, when the said companies entered into a further contract, whereby such properties were leased to the Southern Pacific Company for the term of 34 years, which latter contract is still in full force and effect, and by virtue whereof the Southern Pacific Company entered into, and is now in, the full possession, management, and control of said properties.

In pursuance, also, of the contract of March 28, 1887, the Oregon & California Railroad Company, on about January 3, 1888, executed and delivered to the Union Trust Company its mortgage upon certain of its properties, to secure certain bonds, then issued and thereafter to be issued, of which approximately $17,500,000 in amount are still outstanding. Although executed by the Oregon & California Railroad Company, the bonds were guaranteed by the Southern Pacific Company, and were used by that company to purchase the outstanding securities of the Oregon & California Railroad Company, and to complete the construction of and improve the lines of the said latter company. In this relation, it is averred that said mortgage deed, in so far as it relates to any of the granted lands, if at all, purports to convey, and to authorize the Union Trust Company to sell and convey said lands to persons other than actual settlers, in quantities greater than one quarter section to one purchaser, and for a price exceeding $2.50 per acre, and for purposes other than those authorized by said grants.

During the year 1887, the last section of the East Side Line, extending from Ashland to the southern boundary of the state of Oregon, was completed, and on or about the 6th day of June, 1888, the receivership proceedings were wound up and the receiver discharged. All of the first and second mortgage bonds (not including the issue of July, 1887), together with all mortgages and trust deeds securing the payment thereof, were canceled and discharged; whereupon the Southern Pacific Company entered into the possession and management of all of the properties of the Oregon & California Railroad Company, as aforesaid.

Under the East Side grant, and during the years 1871 to 1877, inclusive, patents for approximately 323,000 acres of land were applied for by, and issued to, the Oregon & California Railroad Company, being lands contiguous to the first 125 miles of said East Side Line. No patents were applied for or issued within that time under the West Side grant. Commencing about the year 1891, other patents were applied for, and, from 1893 up to 1906, lands aggregating 2,450,000 acres were patented to the Oregon & California Railroad Company under the East Side grant: and, commencing about the year 1895, approximately 128,000 acres under the West Side grant. Of the lands so granted, the Oregon & California Railroad Company has made approximately 5,306 sales, aggregating about 820,000 acres, as follows: Sales in quantities not exceeding one quarter section, 4,930, covering 296,000 acres, and sales in quantities exceeding one quarter section, 376, covering 524,000 acres. In this connection, it is alleged: That the Oregon & California Railroad Company, under the direction and domination of the Southern Pacific Company, from the year 1894 until about January 1, 1903, sold and disposed of said granted lands in manner and upon terms in violation and breach of the terms and conditions of the grants. That is to say, said lands were sold to speculators and persons other than actual settlers, and in quantities greatly in excess of one quarter section to one purchaser, namely, in quantities ranging from 1,000 to 45,000 acres to a single purchaser, and for prices greatly in excess of $2.50 per acre; the same ranging from $5 to $40 per acre. That about 90 per cent. of the said 524,000 acres was sold or conveyed since the year 1897, and of this approximately 370,000 acres were sold to 38 purchasers, in quantities exceeding 2,000 acres to each purchaser. On January 1, 1903, there remained unsold of said granted lands approximately 2,373,000 acres, consisting of about 2,080,000 acres which have been patented, and 293,000 acres unpatented, now claimed by the defendant Oregon & California Railroad Company by virtue of said grants.

It is alleged that since January 1, 1903, many persons have applied to the Oregon & California Railroad Company to purchase the lands remaining unsold, in quantities of 160 acres to each purchaser, the said applicants desiring and intending in good faith to settle thereupon, and to make permanent homes thereof; but that said applications have been refused and rejected, and the said Oregon & California Railroad Company and the Southern Pacific Company have, since January 1, 1903, withdrawn all of said unsold lands from sale, and have at all times thereafter refused, and do now refuse, to sell any part of said grants, to actual settlers or for purposes of actual set-

tlement, in quantities or for prices as prescribed by the terms and conditions of such grants. In setting forth these facts, it is further alleged that since said January 1, 1903, the Oregon & California Railroad Company has assumed, and now asserts, an absolute and unconditional estate in and to all of said unsold lands, and that by reason of the premises and the relationship which the Southern Pacific Company sustains to the Oregon & California Railroad Company, all of such unsold lands have been converted to the use and benefit of the said Southern Pacific Company; that the Oregon & California Railroad Company has derived benefits from said grants other than from sales of the lands, namely, from forfeiture of contracts of sale, from leases, and from timber cut from the grants; and in further detail matters are alleged upon which to base injunctive process, and other matters designed to excuse delay in instituting this suit.

On February 14, 1907, a memorial was presented to Congress, praying that steps be taken to compel the Oregon & California Railroad Company to comply with the terms of the said grants, or to require a forfeiture of the lands granted. Later, on April 30, 1908, Congress adopted a joint resolution providing as follows:

"That the Attorney General of the United States be, and he hereby is, authorized and directed to institute and prosecute any and all suits in equity, actions at law, and other proceedings which he may deem adequate and appropriate to enforce any and all rights and remedies of the United States of America in any manner arising or growing out of or pertaining to either or any of the following described Acts of Congress, to wit: 'An act granting lands to aid in the construction of a railroad and telegraph line from the Central Pacific Railroad in California, to Portland, in Oregon,' approved July twenty-fifth, eighteen hundred and sixty-six, as amended by the acts approved June twenty-fifth, eighteen hundred and sixty-eight, and April tenth, eighteen hundred and sixty-nine. * * * Also 'An act granting lands to aid in the construction of a railroad and telegraph line from Portland to Astoria and McMinnville, in the state of Oregon,' approved May fourth, eighteen hundred and seventy, including all rights and remedies in any manner relating to the lands, or any part thereof, granted by either or any of said acts; and in and by any and all such suits, actions or proceedings, the Attorney General shall, in such manner as he shall deem appropriate, assert all rights and remedies existing in favor of the United States, relating to the subject of such suits, actions and proceedings, including the claim on behalf of the United States that the lands granted by each of said acts respectively, or any part thereof, have been and are forfeited to the United States by reason of any breaches or violations of any of the terms or conditions of either or any of said acts which may be alleged and established in any such suits, actions or proceedings; it not being intended hereby to determine the right of the United States to any such forfeiture or forfeitures, but it being intended to fully authorize the Attorney General in and by such suits, actions or proceedings to assert on behalf of the United States and the court or courts before which such suits, actions or proceedings may be instituted or pending to entertain, consider, and adjudicate the claim and right of the United States to such forfeiture or forfeitures, and if found to enforce the same." 35 Stat. 571.

This suit is instituted in pursuance of said joint resolution, and it is further alleged that by reason of the premises all of said granted lands now unsold, and such as were sold in violation of the grants, are forfeited to the United States, and specifically that: "Pursuant to the authority and direction contained in said joint resolution of Congress approved April 30th, A. D. 1908, your orator does hereby assert title to, and does hereby resume the title of, all of said lands and estates in lands forfeited to your orator as aforesaid." The relief demanded is:

(1) That the court adjudge and decree all unsold lands comprised by said grants, whether patented or unpatented, to be forfeited to the United States, and the title thereof quieted; or, if such relief be denied,

(2) That the court adjudge and decree that all such unsold lands are subject to purchase by actual settlers, in quantities of 160 acres to one purchaser,

and for a price not exceeding $2.50 per acre, and that a receiver be appointed to carry into effect the conditions of the grants in that respect; or, if this relief be denied.

(3) That a mandatory injunction issue requiring the Oregon & California Railroad Company to sell such unsold lands in compliance with the terms of the grants.

An injunction is further sought; also, an accounting for moneys received for lands unlawfully sold, discovery, and general relief.

Prior to the filing of the bill of complaint, John L. Snyder and 66 others had instituted suits against the defendants the Oregon & California Railroad Company, the Union Trust Company, and S. T. Gage, to require such defendants to convey to said complainants each a tract of 160 acres of land included in the West Side grant. These parties claim their right to such conveyances by reason of having settled upon lands designated, with a bona fide purpose of making said lands their homes, and of having tendered to the Oregon & California Railroad Company the sum of $2.50 per acre, or $400 for each quarter section so settled upon, in alleged pursuance of the act of May 4, 1870, making such grant. When, however, the United States instituted its suit making the complainants in the Snyder suit parties thereto, the causes were consolidated, and Snyder and others have filed their cross-bill in the government's case, setting up their alleged rights. The particular feature of this cross-bill, after setting out the history of the grant in purport much as it is narrated in the complaint, is voiced in its ninth paragraph, whereby it is alleged, in substance: That Congress, by the act of May 4, 1870, intended to and did grant to the Oregon Central Railroad Company, and to its successor, the Oregon & California Railroad Company, a limited beneficial interest in the lands specified in the act, and to that end made and constituted the Oregon & California Railroad Company a mere intermediary trustee, through which to convey the legal title to the odd-numbered sections comprised by the grant to such citizens of the United States as might thereafter settle upon such lands. That Congress did not intend to grant to said railroad company any possessory title to any of said lands, except for depot grounds, stations, etc., but reserved the right to citizens of the United States to enter upon and take possession of all of said lands, and to purchase the same from the railroad company upon becoming actual settlers upon the respective tracts selected; in other words, in order to afford financial aid to the grantee, Congress constituted the railroad company a trustee, for the express purpose, and with power and authority to sell and convey the lands designated to actual settlers, and that thereby the railroad company became a trustee as to such lands for the United States, and for all citizens of the United States who may now be actual settlers upon such lands. It is further asserted that the railroad company refused to accept the tender made by cross-complainants of the purchase price, and refused and still refuses to make conveyances of the lands selected and settled upon, and now claims and asserts ownership of the absolute fee-simple title thereto.

Many persons, amounting to several thousand, through intervention permitted by order of the court, have filed complaints against the defendant railroad companies, claiming the right to purchase from the Oregon & California Railroad Company certain lands comprised by the grants of Congress of July 25, 1866, and May 4, 1870. These complaints, in their narration of the history of the grants, follow very closely the allegations contained in the government's bill. The particular claim, however, upon which the complainants therein found their alleged right, is set forth, in substance, as follows: That since January 1, 1903, and prior to the commencement of the government's suit, the interveners applied to the Oregon & California Railroad Company to purchase certain of the lands comprised by the aforesaid grants; that in so applying each of the said interveners made request to purchase 160 acres or one quarter section of land, and thereupon offered to pay to said company the sum of $2.50 per acre, or $400 per quarter section, and tendered the amount each for the parcel of land selected, and demanded a deed of conveyance therefor, under the alleged terms and conditions of the grants of Congress; that each of the interveners, ever since his application to purchase was made, has been

and now is ready and willing to pay said money consideration, and offers to bring the same into court to be used for such purpose, if the court shall so order; and that each is a qualified purchaser under the terms of the grants, and at the time of the application intended, and now intends, to make actual settlement upon the tract of land so selected, and henceforth to use the same as an actual settler.

It is further alleged that the interveners have a prior right, estate, and vested interest in the property, to the extent of the amount of land which each has so applied to purchase; that, under the terms and conditions of said acts of Congress, it was the legal duty and obligation of the Oregon & California Railroad Company to issue its deed for the lands applied for upon payment of the purchase price as named; and that as to such interveners the court is without jurisdiction to declare the lands forfeited to the government.

Many other persons have also intervened, by permission of the court, who have made applications to the Oregon & California Railroad Company to purchase since the commencement of the government's suit, who base their alleged right and claim upon like application and tender as the prior interveners; the allegations of their complaints conforming very nearly to those of such prior interveners.

Demurrers to the government's bill, to the cross-bill, and to all bills of intervention, which are pertinent to raise the paramount questions involved by the controversy, have been interposed by the defendant railroad companies and Stephen T. Gage, and also by the Union Trust Company.

John McCourt, U. S. Atty., B. D. Townsend, and Tracy C. Becker, Special Counsel for the Government.

P. F. Dunne, Wm. D. Fenton, and Wm. Singer, Jr., for defendants.

A. W. Lafferty and Arthur I. Moulton, for cross-complainants.

C. I. Leavengood, Charles E. Shepard, Wm. H. Flett, Jno. Mills Day, and M. E. Brewer, for interveners.

WOLVERTON, District Judge (after stating the facts as above). Counsel for the defendant railroad companies and S. T. Gage make the following points of contention in support of their demurrers to the bill of complaint, the cross-complaint, and the bills in intervention: I quote from their reply brief:

"(1) Rights acquired by the East Side Company under the act of 1866 deprived Congress of the power, by amendatory act of 1869, to impose new conditions on the estate; besides, the amendatory act expressly saved 'rights acquired' under the act of 1866.

"(2) The controlling purpose of Congress in making the land grants, here and by the Union Pacific act, as expressly stated in each act, is the same; hence here, as there, any policy of Congress to promote settlement of the lands 'was manifestly subordinated to the higher purpose of having the road constructed with the aid of the land grant.' [Platt v. Union Pacific R. Co.] 99 U. S. 48–67 [25 L. Ed. 424].

"(3) The 'actual settler' proviso is not a condition, because it does not (a) inure specially to the grantor, nor (b) indicate that forfeiture shall attend its breach, and (c) is not compulsory; but if a condition it is void for (d) repugnancy to the grant, and (e) restraint of alienation.

"(4) The 'actual settler' proviso is a personal covenant between grantor and grantee, only. Specific performance cannot be enforced because (a) it is not compulsory, (b) lacks mutuality of right and remedy, and (c) is in the nature of a continuing contract. Besides, whether compulsory or prohibitive, it is (d) in restraint of alienation.

"(5) As the 'actual settler' proviso is not compulsory, withdrawal of the lands in suit from sale is not a breach; and the other alleged breaches would not operate forfeiture of these unsold lands, were the proviso a condition.

"(6) Were the 'actual settler' proviso a condition, broken as alleged, grantor has waived the breach by: (a) Apparent acquiescence in the many deeds

of record made by the railroad company in violation of the proviso; (b) acceptance and use of the road; (c) annual issuance of land patents, from 1871 to 1906; and by (d) effect of the general forfeiture acts of January 31, 1885, and September 29, 1890.

"(7) The land patents are conclusive. Were they void, the title which they purport to convey was confirmed by the force and effect of the acts of March 3, 1891, and March 2. 1896; which acts also bar this suit as to all lands patented prior to October, 1902.

"(8) All causes of action sought to be presented by the bill, other than forfeiture and to quiet title, are also barred by laches and limitations; it appearing that as to those other causes of action complainant is not the real party in interest. Cross-complainants and interveners are also barred by laches and limitations.

"(9) Were the 'actual settler' proviso a condition, which has been broken, still this suit could not be maintained as one to enforce forfeiture, nor to quiet any title which complainant could acquire by such a judgment, because: (a) Grantor has not declared forfeiture; (b) the fact of forfeiture has not been adjudged at law; and (c) the defendant railroad company holds the legal title and possession."

These will be considered, though not in the order of their statement; but in the meanwhile it will be necessary to determine the contentions of the cross-complainants and interveners.

It should be premised that the theory of the bill is not that the grants have not been fully earned so as to entitle the Oregon & California Railroad to have the patents issue, but that, being earned, and patents in large measure having issued, the company has failed to comply with certain terms attending the grants, which it is claimed are conditions subsequent qualifying the estate granted, and that thereby the estate, whether now held under patent or as yet in pursuance of the acts making the grants, has been forfeited to the United States.

The several acts, namely, the act of July 25, 1866, the acts of June 25, 1868 and April 10, 1869, amendatory thereof, and the act of May 4, 1870, contain all of the provisions of Congress relative to the granting of the public lands in question. Scarcely four years elapsed from the inception of the legislation until the last act was adopted, and, viewed as a whole, extending from the first to its final development and adaptation, it indicates a common purpose, and should be considered in pari materia.

A corporation bearing the name "Oregon Central Railroad Company" was organized October 6, 1866, with its principal office at Portland, Or. This company, it is alleged, projected its line of road southward from Portland, on the westerly side of the Willamette river, and on October 10, 1866, the Legislative Assembly of the State of Oregon (Laws 1866, p. 81) by joint resolution, designated it as the company entitled to receive the grant under the act of Congress of July 25, 1866. This company also adopted a resolution on May 25, 1867, assenting to the provisions of the grant, and filed a copy thereof with the Secretary of the Interior July 6, 1867. On August 20, 1868, the company filed with the Secretary of the Interior a map of survey of its projected line. On April 22, 1867, another corporation was organized, under the same name, with its principal place of business at Salem, Or. This company, claiming that the one previously organized was not lawfully incorporated, procured, on October 20, 1868, the adoption of a joint resolution by the Legislative Assembly of Oregon,

designating it as the organization entitled to receive the grant. This resolution by preamble sets out that at the time of its adoption no such company as the Oregon Central Railroad Company, with its principal office at Portland, was organized or in existence, and that the previous joint resolution designating that company as the one entitled to receive the grant was adopted under a misapprehension of the facts. On June 8, 1869, the company last organized, with its principal office at Salem, being the East Side Company, adopted a resolution assenting to the provisions of the act of Congress of July 25, 1866, and specifically to the amendments thereto, which resolution was filed in the office of the Secretary of the Interior June 30, 1869. On October 29, 1869, this company filed its map of survey and location of the first 60 miles of its projected line of railroad on the East Side, and on December 24, 1869, completed the construction of its first 20-mile section; the same being approved on the 31st of that month. The allegations of the bill do not show that the company was engaged in the work of construction prior to the time of filing its assent, namely, June 30, 1869; but for the purposes of this controversy it may be assumed that such was the case, as it is not at all probable that the section was built in so short a time as intervened between the date of such filing and that of the completion of the section.

On July 2, 1870, the company first organized—the West Side Company—by resolution assented to the grant of May 4, 1870, and filed a copy of such resolution with the Secretary of the Interior July 20, 1870. The Oregon & California Railroad Company was incorporated March 17, 1870, and on March 29, 1870, it took over, by assignment and transfer, all of the property, rights, and franchises of the East Side Company, including its grant of public lands by virtue of the act of Congress of July 25, 1866, and the acts amendatory thereto. By resolution adopted April 4, 1870, this company accepted the grant upon the terms and conditions specified. A copy of the resolution was filed with the Secretary of the Interior April 28, 1870. Ever since such transfer, the latter company has exercised control in the construction of the East Side Road and over the grant of Congress to the East Side Company; and the West Side Company has never, since filing its assent to the West Side grant, claimed or assumed to exercise any control over the affairs, rights, or privileges of the East Side Company.

Now, bearing in mind the various acts of Congress touching these grants, the resolutions of the Legislature of the state, and the proceedings of these several corporations, we will consider the first contention of defendants' counsel, together with the incidental questions presented in support of the demurrer to the bill.

[1] It is stoutly urged that these grants are in præsenti, and with reference to the East Side grant that it became operative, by relation back to the date of the act of Congress conferring the grant, upon the designation by the Legislature of the state of the Oregon Central Railroad Company (East Side) as the one entitled thereto, October 20, 1868. That is to say, that, upon that date, the grant became vested in the East Side Company, subject to the conditions imposed for construction, etc., and hence that the amendment of April 10, 1869, re-

quiring the lands granted to be sold to actual settlers, in quantities not exceeding 160 acres to one purchaser, and at a price not exceeding $2.50 per acre. was beyond the power of Congress to enact.

It is undoubtedly true, as argued, that the grant could not become operative until there was a grantee in being, or in existence, capable of taking; nor could it become operative until a company was designated by the Legislature of the state as the one entitled to the benefits thereof, as, under the provisions of the act conferring the grant, it was to the company that should be so designated. The words "that there be, and hereby is, granted," standing alone, unquestionably import a transfer of present title. When read in connection with the terms of the grant, and in relation to the thing granted, they may or may not bear such signification. Where a grantee is actually in existence and qualified to take according to the terms of the law, the words alluded to operate as an immediate and present transfer. But it is otherwise if the grantee is not in existence, or has not qualified himself in pursuance of the terms of the grant to entitle him to that which is offered. Instances of a present transfer are illustrated by the following cases:

Leavenworth, etc., R. R. Co. v. United States, 92 U. S. 733, 23 L. Ed. 634, which related to a grant to the state to aid in the construction of certain railroads; the companies to be aided being named and designated in the act making the grant. Schulenberg v. Harriman, 21 Wall. 44, 22 L. Ed. 551, which was also on a transfer to the state "to aid in the construction of railroads"; the holding being that the state acquired a present estate by the terms of the grant. Lessieur v. Price, 12 How. 59, 13 L. Ed. 893, a grant to the state of four sections of land, to be selected, for the purpose of fixing the seat of government thereon. Railroad Company v. Smith, 9 Wall. 95, 19 L. Ed. 599, a grant of swamp lands to the state. And Michigan Land & Lumber Co. v. Rust, 168 U. S. 589, 18 Sup. Ct. 208, 42 L. Ed. 591, also a grant of like lands to the state.

In all such and like cases, where identification of the lands in contemplation has been necessary, as by the definite location of the line of railroad which determines the particular sections comprised by the grant, or by the ascertainment of the quality of the land in determination of its swampy character, the grant is said to take effect at the time of the identification or ascertainment, but by relation back to the date of the grant, notwithstanding the grant is denominated as one in præsenti and vests a present estate. Where, however, the grantee is not in existence, or is required to do something by which to qualify himself to take under the terms and conditions prescribed, then the grant does not vest a present estate; nor does it become operative except at the time the contemplated grantee comes into being or qualifies himself to receive the designated bounty. As is said by Mr. Chief Justice Waite, in Hall v. Russell, 101 U. S. 503, 509, 25 L. Ed. 829:

"There cannot be a grant unless there is a grantee, and consequently there cannot be a present grant unless there is a present grantee. If, then, the law making the grant indicates a future grantee and not a present one, the grant will take effect in the future and not presently."

In that case, the grant, which was in pursuance of the donation act of September 27, 1850 (Act Sept. 27, 1850, c. 76, 9 Stat. 496), was to a white settler or occupant of the public lands "who shall have resided upon and cultivated the same for four consecutive years," and the distinguished jurist further said:

"Whenever a settler qualified himself to become a grantee, he took the grant and his right to a transfer of the legal title from the United States became vested. But until he was qualified to take, there was no actual grant of the soil."

It was concluded that there was no grant of land to the settler until he had qualified himself to take by completing his four years of residence and cultivation, and performed such other acts in the meantime as the statute required in order to protect his claim and keep it alive, and that "down to that time he was an authorized settler on the public lands, but not a grantee." In such a case, therefore, the grant is of the date the settler qualifies himself to take; the court making no declaration concerning the doctrine of relation. The doctrine of relation, while a fiction of law, is potent for subserving the purposes of justice, and is applied only for the security and protection of persons who stand in some privity with the party initiating proceedings for land, and who has acquired the equitable claim or right to the title. By it is meant:

"That principle by which an act done at one time is considered by a fiction of law to have been done at some antecedent period. It is usually applied where several proceedings are essential to complete a particular transaction, such as a conveyance or deed. The last proceeding which consummates the conveyance is held for certain purposes to take effect by relation as of the day when the first proceeding was had." Gibson v. Chouteau, 13 Wall. 92, 100, 20 L. Ed. 534.

See, also, Lynch v. Bernal, 9 Wall. 315, 325, 19 L. Ed. 714.

Applying this doctrine in a case involving rights acquired under the timber act of June 3, 1878 (chapter 151, 20 Stat. 89 [U. S. Comp. St. 1901, p. 1545]), Mr. Justice Brewer, in United States v. Detroit Lumber Co., 200 U. S. 321, 334, 26 Sup. Ct. 282, 286 (50 L. Ed. 499), says:

"It is a doctrine of frequent application, designed to promote justice. * * * The ordinary railroad land grants have been grants in præsenti, and under them the title has been adjudged to pass, not at the completion of the road, but at the date of the grant. (Citing authorities.) A patent from the United States operates to transfer the title, not merely from the date of the patent, but from the inception of the equitable right upon which it is based. Shepley v. Cowan, 91 U. S. 330 [23 L. Ed. 424]. Indeed, this is generally true in case of the merging of an equitable right into a legal title. Although the patents in this case were not issued until after the sales of the timber, yet when issued they became operative as of the date of the original entries."

If the doctrine of relation were applied in the case of Hall v. Russell, supra, we should say that the grant was of the date the settler qualified himself to take with relation back to the date of the initiation of his claim, but not to the date of the enactment of the donation law. In the present case the grant was to a company to be organized, and to such a one as the Legislature of the state of Oregon should desig-

nate as entitled thereto. It is plain, under the authorities, that no title passed until the organization was perfected and the designation of the Legislature made. Nor do I think that the grant became operative until the company filed its assent to the terms and conditions of the act, as required by section 6 thereof, as amended April 10, 1869. It was one of the conditions of the act that the assent be filed, and it was by the observance thereof that the grantee qualified itself to take. Indeed, it was the first act required to be done on the part of the grantee for the initiation of a claim under the grant, and without such an assent no one could know that it purposed availing itself of the benefits of the act conferring the grant. Hence, under the doctrine of the cases, the act of July 25, 1866, could not operate to vest an interest in the grantee until the organization qualified itself by assenting to the terms of the act in the manner prescribed; and, whether the grant then took effect by relation back to the date of the act or not, Congress was wholly authorized to add such amendments in the meantime as it saw fit. It disturbed no vested right of the grantee by so doing. But, however this may be, there is another reason rendering it competent for Congress to make the amendment. On October 10, 1866, the Legislature of Oregon designated the West Side Company as the organization entitled to the grant, and that company filed its assent to the provisions of the act of July 25, 1866, with the Secretary of the Interior July 6, 1867, within the year, and in these respects it would seem that the law had been complied with.

But the East Side Company, organized April 22, 1867, set up a claim to the grant, which was evidently brought to the attention of the Legislature of the state, for that body, assuming that it had previously designated a company not in existence as entitled to the grant, designated the East Side Company as the one proper to receive the benefits thereof. This was on October 20, 1868, being more than one year subsequent to the passage of the act of July 25, 1866. From this time, the West Side Company made no further claim to this particular grant, and later accepted a new grant. So that the West Side Company was no longer entitled to the benefits of the act of 1866, and whatever controversy existed between the two companies was thus ended. On June 13, 1869, the East Side Company filed its assent, whereby it accepted all the provisions, rights, privileges, and franchises of the act of July 25, 1866, and of all acts amendatory thereof, and upon the conditions therein specified. Congress had amended the original act by extending the time for completion of the first and subsequent sections of 20 miles each of the road, and for the completion of the whole. This was prior to the date when the Legislature of the state designated the East Side Company as the one entitled to receive the grant, and, had it not been for the amendment, the East Side Company would then have been in default in construction work, and, under section 8, the act would have been rendered null and void. Then followed the amendment of April 10, 1869, extending the time for filing assent, being the one containing the proviso that the lands granted shall be sold to actual settlers. There was some reason for passing this amendment. Congress undoubtedly believed that it was necessary so that the act might be com-

plied with in that respect, and the East Side Company supposed that it was necessary to the acquirement and completion of its rights to the grant, for it soon thereafter signified its assent to the original act by resolution ·adopted and duly filed with the Secretary of the Interior. The language of the resolution leaves no doubt as to the purpose of the company. Now, here was a legislative interpretation of the act of July 25, 1866, that it was necessary to the acquirement of the grant that the company seeking its benefits should file assent thereto, and for that purpose an extension of time was given. On the other hand, there was a complete assent to the interpretation on the part of the railroad company, thus ratifying, if need be, the act of Congress in making the extension of time and requiring sale of the lands to actual settlers. This all under the reservation in the original act, by section 12, of the authority of Congress to alter, amend, or repeal the same.

The view thus entertained is not without authoritative support. In St. Paul, etc., Railway Co. v. Greenalgh, 139 U. S. 19, 11 Sup. Ct. 395, 35 L. Ed. 71, Congress by an act extended time to the St. Paul & Pacific Railroad Company within which to complete its road, upon. condition:

"That all rights of actual settlers and their grantees who have heretofore in good faith entered upon and actually resided on any of said lands prior to the passage of this act, or who otherwise have legal rights in any of such lands, shall be saved and secured to such settlers or other such persons in all respects the same as if said lands had never been granted to aid in the construction of the said lines of railroad."

In conjunction therewith the railroad company was required to file a formal acceptance of the conditions in the Department of the Interior for record. Notwithstanding it did not affirmatively appear that any acceptance was ever signed, it was considered, in the absence of such proof, that, as the company continued to assert and exercise ownership over the road, it had in fact accepted the conditions imposed. Hence it was adjudged that a settler upon the lands of the grant prior to the act extending the time for completion of the road acquired a right superior to that of the railroad company. Thus in effect the amendment of the statute conferring the grant was acceded to by the grantee, and it thereby became bound by it. In this relation the court says:

"A mere breach of condition does not of itself work a forfeiture of a grant; some other proceeding must be taken by the grantor to indicate his dissatisfaction with the breach and his intention to exercise his rights to revoke the grant and take possession of the property in consequence thereof. While in this case no specific action was taken by Congress to work a forfeiture of the grant, or by the state, yet the continued possession and use of the property by the company were, in fact, subject to the condition that the rights of settlers upon the lands at the time should not be interfered with, where such settlements had been made in good faith, as was the case in the present instance. And· it would be in the highest degree inequitable to allow the company to have all the benefits of the extension of time to complete its road, so as to avoid any forfeiture of its privileges and franchises, without at the same time holding it to the conditions affecting the rights of settlers upon the lands of the company, in consideration of which the extension was made."

So it is here, the railroad company acceded to the amendment by complying specifically with its requirements, saying nothing of its alleged participation in securing the passage thereof.

It is insisted that the amendment extending the time for completing the road was a waiver on the part of Congress of the necessity for filing an assent, because it was adopted more than one year after the adoption of the main act, and the amendment makes no mention of the time for filing assent. The answer to this is that Congress did not so treat it, and the railroad company evidently did not so regard it, for both proceeded upon the theory that the assent was yet essential to the earning of the grant. But it is said that, at the time of the designation by the Legislature of the East Side Company as entitled to the grant, the company had already assented to the conditions of the act conferring it, by implication, because it was organized especially for subserving the purposes of the act, and had then been in the active construction of the road for some time, and therefore that the act then became operative. It is not alleged in the bill that the company was then engaged in the construction of its road; but, conceding that it was, Congress had made express assent essential by direct terms, and the time of that assent was also made of the essence of the grant, for the grant was made dependent upon the observance of the provision.

Construing the act as a law, however, as it will presently appear it should be construed, which requires that the intendment of Congress shall govern rather than that the law of specific performance of a contract shall be applied, the construction of the act of Congress, together with its subsequent amendment and the acquiescence of the railroad company therein, again becomes paramount and controlling, and the express assent dominates the grant, so that it does not become operative until that assent is given. See Rogers v. Port Huron & Lake Mich. R. R., 45 Mich. 460, 468, 8 N. W. 46, 50. As was said in this case, which bears a close analogy to the case at bar as it pertains to the present question:

"This acceptance was the only act whereby any of these companies was brought into contract relations with the state at all. The law did not assume to force the grant upon any company, and the contract could not bind either party until both assented to the same agreements and conditions."

The clause in the amendment of April 10, 1869, protecting any rights theretofore acquired by any railroad under the original act, was intended, looking to the history of the legislation, to protect the West Side Company, as at that time there was a controversy between the East Side and West Side Companies as to which was entitled to claim the grant. The West Side Company had previously been designated by the Legislature as entitled to the benefits of the act, and it had furthermore filed its assent, so that, but for the fact that the East Side Company was now claiming the grant, the West Side Company was apparently entitled to it, and, while Congress did not assume to settle the differences between these companies, it did intend to preserve any rights of the West Side Company that it had then acquired. So it was further enacted that the amendment should not be construed as to entitle more than one company to the grant; thus leaving the companies to adjust the matter between themselves. The adjustment came when the West Side Company also obtained a grant.

Nor is this case controlled by the case of the United States v. Oregon & California Railroad Company, 176 U. S. 28, 51, 20 Sup. Ct. 261, 44 L. Ed. 358, for the stipulation upon which that cause was determined shows a different state of facts from those here presented. That construction is preferred which will give meaning, force, and operation to all the clauses of an act, rather than that one clause should nullify another, unless it be that there is a clear and irreconcilable repugnance between them. It is hardly reasonable to suppose that the clause protecting any company against the impairment of rights accrued was designed in any way to nullify the provision requiring sales to be made to actual settlers, etc., seeing that the latter provision is a part of the same amendment, and follows immediately after the former clause.

The sixth and seventh points of contention will be considered together. It is strongly insisted that the government has in several ways waived, or has precluded itself of the right at this time to insist upon, a forfeiture of the lands in question:

First, by the issuance of its patents to such of the lands comprised by the grant as have been patented.

Second, by not sooner insisting upon the forfeiture; it being assumed that the government was in possession of knowledge of certain breaches of the condition requiring the grantee railroad companies to sell to actual settlers.

Third, by the act of Congress of September 29, 1890 (chapter 1040, 26 Stat. 496 [U. S. Comp. St. 1901, p. 1598]), entitled "An act to forfeit certain lands heretofore granted for the purpose of aiding in the construction of railroads and for other purposes"; and as to the West Side grant by an act approved January 31, 1885 (chapter 46, 23 Stat. 296), entitled "An act to declare forfeiture of certain lands granted to aid in the construction of a railroad in Oregon."

Fourth, by the act of March 3, 1891 (chapter 561, § 8, 26 Stat. 1099 [U. S. Comp. St. 1901, p. 1521]), fixing a time beyond which suits to annul and vacate patents issued by the United States may not be instituted, together with the act of March 2, 1896 (chapter 39, 29 Stat. 42 [U. S. Comp. St. 1901, p. 1603]), relating to suits by the United States for vacating any patent to lands theretofore erroneously issued under railroad or wagon-road grants, which is a re-enactment, or rather amendatory of the preceding act.

First, as to the effect of the issuance of the patents: By reference to the bill of complaint, it will be noted that patents were issued subsequent to 1871, running to 1906, inclusive, for approximately 2,765,-597 acres of the East Side grant, and of the West Side grant 128,618 acres. The discussion must proceed with reference to the theory of the government in seeking to maintain this suit, which is that the "settlers clause" in the amendment of April 10, 1869, and in the act of May 4, 1870, is a condition subsequent to be observed on the part of the railroad companies; that, if not observed, a forfeiture of the lands would be incurred; and that such provision is a condition attending and upon which the grant was made. Whether the theory can be substantiated in law will be a subject for consideration later.

To recur to the act of July 25, 1866, the first section relates to the authorization of the railroad company to construct the road; the second to the grant of the lands, the said lands to be applied to the building of the road; and the third section to the grant of the right of way. The fourth section relates to the issuance of the patents. These were required to be issued whenever any section of 20 miles of the road was completed, upon the report of the commissioners showing that the road had been constructed and equipped in all respects as required by the act. The fifth section prescribes that the grants are made upon condition that the companies shall keep the road in repair and use. The sixth relates to the filing of the companies' assent and the time of the completion of the road, section by section, as specified; and the eighth section, besides providing for forfeiture for noncompliance with specific provisions, authorizes Congress, in case the road is not kept in repair or fit for use after completion, to pass an act to put the same in repair and use, and to appropriate the income for defraying the expenses thereof. These comprise all the provisions of the act which can have any bearing upon the issuance of patents for lands earned under the provisions of the grant.

[2] All public grants are administered by the Land Department, which is a part of the administrative and executive branch of the general government, and was organized to supervise all the various proceedings by which title to public lands is acquired, from their commencement to their close. Before the issuance of any patent, the Land Department is charged with the duty of ascertaining and determining whether all the conditions of the law entitling it to issue have been complied with. It may be that the issuance depends upon the existence of certain facts, or the performance of certain obligations imposed, or the observance of specific regulations; and in all these the Land Department must ascertain and determine whether the law has been fulfilled so as to entitle the grantee to his final patent under the grant. Within its special jurisdiction, and wherein its function is to conduct inquiry into matters of fact, the Land Department acts judicially, and its findings and judgments, while proceeding within the scope of its powers, are as binding and conclusive as the findings, judgments, and decrees of any other special tribunal, and they are unimpeachable and unassailable except by direct proceeding instituted for their correction or annulment. This much for the solemnity and integrity of the acts of the Land Department when in the exercise of its judicial functions. These functions are usually brought into requisition in the considerations and determinations relative to the issuance of patents, both under general laws for disposal of the public domain to private persons, and under specific grants for railroad and other purposes.

In Barden v. Northern Pacific Railroad, 154 U. S. 288, 327, 14 Sup. Ct. 1030, 1038 (38 L. Ed. 992), a case concerning a grant for railroad purposes, the court declares that:

"It is the established doctrine, expressed in numerous decisions of this court, that wherever Congress has provided for the disposition of any portion of the public lands. of a particular character, and authorizes the officers of the Land Department to issue a patent for such land upon ascertainment of certain facts, that department has jurisdiction to inquire into and

determine as to the existence of such facts, and in the absence of fraud, imposition, or mistake, its determination is conclusive against collateral attack." "The patent of the United States, is," it is said, "the conveyance by which the nation passes its title to portions of the public domain." Smelting Co. v. Kemp, 104 U. S. 636, 640 [26 L. Ed. 875.]

This under the general laws for disposition of the public lands. And it is further said that:

"The execution and record of the patent are the final acts of the officers of the government for the transfer of its title, and, as they can be lawfully performed only after certain steps have been taken, that instrument, duly signed, countersigned, and sealed, not merely operates to pass the title, but is in the nature of an official declaration by that branch of the government to which the alienation of the public lands, under the law, is intrusted, that all the requirements preliminary to its issue have been complied with."

Ordinarily, the patent under a grant for railroad purposes does not operate to pass the title, for that is done by virtue of the grant itself, in which case the patent is rather in the nature of a confirmation of the grant, and in further assurance of title, bearing the force and effect of a solemn certificate that all things have been done and observed entitling the patentee to his grant at that particular juncture.

Says Mr. Justice Field, in Langdeau v. Hanes, 21 Wall. 521, 529, 22 L. Ed. 606:

"In the legislation of Congress a patent has a double operation. It is a conveyance by the government when the government has any interest to convey; but, where it is issued upon the confirmation of a claim of a previously existing title, it is documentary evidence, having the dignity of a record, of the existence of that title, or of such equities respecting the claim as justify its recognition and confirmation. The instrument is not the less efficacious as evidence of previously existing rights because it also embodies words of release or transfer from the government."

The eminent jurist, in a later case concerning lands comprised by a railroad grant (Wisconsin Railroad Co. v. Price County, 133 U. S. 496, at page 510, 10 Sup. Ct. 341, at page 346 [33 L. Ed. 687]), after holding that the grant was in præsenti, says:

"The subsequent issue of the patents by the United States was not essential to the right of the company to those parcels, although in many respects they would have been of great service to it. They would have served to identify the lands as coterminous with the road completed; they would have been evidence that the grantee had complied with the conditions of the grant, and to that extent that the grant was relieved of possibility of forfeiture for breach of them; they would have obviated the necessity of any other evidence of the grantee's right to the lands; and they would have been evidence that the lands were subject to the disposal of the railroad company with the consent of the government. They would have been in these respects deeds of further assurance of the patentee's title, and, therefore, a source of quiet and peace to it in its possessions."

This language was substantially repeated in Deseret Salt Company v. Tarpey, 142 U. S. 241, 251, 12 Sup. Ct. 158, 35 L. Ed. 999, where a question was suggested as to the necessity for patents where the title passed by the act conferring the grant.

Let us ascertain now what the Land Department, in acting in its supervisory character in the administration of these grants, was required to ascertain and determine relative to the lands granted before issuing patents therefor. It must know that the railroad company was

duly incorporated, properly designated by the state Legislature as entitled to the benefits of the act, and duly authorized to take the grant. It must know that the lands for which patents are sought are within the place or indemnity limits of the grant, and that they have not been reserved, sold, or otherwise disposed of. It must know that the section of 20 miles opposite which the lands are sought to be patented has been completed and equipped in all respects as required by the act conferring the grant and the amendments thereto, section by section of 20 miles each in its order as the road progresses; and, if the entire road was completed and equipped according to law, the Land Department must know that. In this respect the Land Department is aided by the commissioners appointed by the President for the express purpose of ascertaining and making report relative to the facts pertinent to the inquiry. When these facts have been ascertained and determined to exist, then it is incumbent upon the Land Department to issue the patents. The department is required to look no further, nor to concern itself with what the railroad company is bound to do in the future to preserve the integrity of the grant, or to prevent its forfeiture, if such a thing is within the purpose and intendment of Congress.

Now, recurring again to the theory of the bill of complaint that the settlers clause imposes a condition subsequent upon the railroad company for the breach of which a forfeiture would be incurred, it is plain that the Land Department could have nothing to do with any alleged breach of the condition, as by the very order of things such breach would come after the time when it would have passed judgment with relation to the issuance of the patents under the grant. The issuance of the patents, therefore, by the Land Department could be taken neither as a waiver on the part of the government of the right to insist upon the condition subsequent, nor as adjudication conclusive against the government's insistence upon the performance of such a condition.

[3] The second ground upon which waiver is predicated is that the government has not sooner insisted upon forfeiture, knowing that breach of the alleged condition subsequent has been committed. The infractions of the condition referred to consist in the assignment and transfer by the East Side Company of all its right, privileges, franchises, and property, including the right, title, and interest of the company in and to the granted lands, East Side, to the Oregon & California Railroad Company March 29, 1870, and a like transfer of the West Side grant October 6, 1880, the execution of certain mortgages noted in the bill of complaint, covering the granted lands, and other conveyances.

As to the transfers to the Oregon & California Railroad Company, these were not intended as a sale and disposition of the lands, but the transactions were designed to work a substitution of the latter company for its predecessors, so that the intention and purpose of Congress, voiced by the enactments conferring the grants, might be carried into effect through its instrumentality, thus conceding to it the rights and benefits to accrue to the original companies, but nothing beyond. Such is the theory upon which the bill of complaint is drawn, and such is clearly the effect of the transfers. The Oregon & Califor-

nia Railroad Company has so treated them, and so has the government. As it pertains to the East Side grant, the Oregon & California Railroad Company specifically assented to the act conferring it, and assented to the grant itself on April 4, 1870, within the extended time for filing assent by the amendment of April 10, 1869. The assent was, however, not filed with the Secretary of the Interior until April 28th. But no importance is attached to that. As to both grants, patents have been issued by the government to the Oregon & California Railroad Company, and accepted by it as the grantee, and in all transactions since the transfers the Oregon & California Railroad Company has been treated, and it, has so treated the relationship with the government, as the grantee company.

[4] As it relates to the mortgages, if considered as evidencing sales of the granted lands, and other conveyances in alleged violation of the stipulations of the settlers clause, there is nothing stated in the bill from which it can be inferred that the government assented to them in any way, and hence it cannot be considered to have waived the condition.

"Mere indulgence or silent acquiescence is never construed into a waiver unless some element of estoppel can be invoked." 29 A. & Eng. Enc. of Law, 1106.

So it is said in Gray v. Blanchard, 8 Pick. (Mass.) 284, 292:

"A mere indulgence is never to be construed into a waiver of a breach of condition; and so are the authorities."

See, also, Trustees of Union College v. City of New York, 173 N. Y. 38, 65 N. E. 853, 93 Am. St. Rep. 569; Howe v. Lowell, 171 Mass. 575, 51 N. E. 536; Carbon Block Coal Company v. Murphy et al., 101 Ind. 115.

There is certainly nothing contained in the bill of complaint that shows that the government did more than to remain silent while the Oregon & California Railroad Company was disposing of the lands in violation of the condition prescribed by the settlers clause, if it be a condition, and one of which the government can avail itself. It did nothing affirmatively or actively by which to mislead the railroad company or cause it rightfully to presume upon the government's acquiescence. So that the government has neither waived, nor is it estopped to insist upon, forfeiture for condition broken, if forfeiture may be predicated upon the clause. This will be determined later.

[5] Furthermore, it is not believed that the executive officers of the government can, without express authority from Congress, waive the conditions expressed in a grant emanating from Congress.

[6] The acceptance and use of the road by the government was contemplated from the beginning, and could not operate as a waiver of a condition subsequent attending the grant.

[7] If it be the purpose to ground the defense upon laches, that cannot be done, for laches is not imputable to the government.

The other ground of waiver as assigned cannot be supported. The act of Congress of September 29, 1890, supra, declares:

"That there is hereby forfeited to the United States, and the United States hereby resumes the title thereto, all lands heretofore granted to any state

or to any corporation to aid in the construction of a railroad opposite to and coterminous with the portion of any such railroad not now completed, and in operation, for the construction or benefit of which such lands were granted; and all such lands are declared to be a part of the public domain." Section 1.

[8] It has been held, in United States v. Tennessee & Coosa Railroad Co., 176 U. S. 242, 20 Sup. Ct. 370, 44 L. Ed. 452, that this act did not operate upon lands opposite completed road, and did not work a forfeiture as to them. It is urged that, under the rule, "Expressio unius est exclusio alterius," the act operates as a declaration of waiver of forfeiture as to all lands opposite the completed portions of all railroads. This is equivalent to saying that the effect of the act was to confirm to the railroad companies all lands opposite completed railroads, or portions thereof. The application sought is a novel one. To say that forfeiture by Congress of lands opposite railroads not constructed is to confirm to the grantees the lands opposite roads constructed, against all contingencies and reserved conditions, whether precedent or subsequent, is carrying the doctrine beyond its purpose and effect. It could not be presumed that Congress, when adopting the general statute applying to all lands under grants lying opposite parts of railroads uncompleted, had in mind all conditions subsequent that might have been annexed to grants where the roads had been completed. The thing is so manifest that it requires no argument; it is sufficient to state the proposition. So Congress could not have intended, by the act under discussion, to confirm the grants here concerned against any condition subsequent that might have been annexed to them, and, if not intending so to do, the act could not operate as a waiver of forfeiture of conditions subsequent, if broken. The same is true of the act of January 31, 1885, c. 46, 23 Stat. 296, forfeiting the unearned land grant to the West Side Company, although its operation was not general, but related to the forfeiture of a portion of one grant only.

[9] The fourth ground upon which waiver is predicated relates to the statutes of limitation for bringing suits for the annulment of patents, and is rather an objection going to the remedy or the right to institute the suit. The statutes invoked are section 8 of the act of March 3, 1891, c. 561, 26 Stat. 1099 (U. S. Comp. St. 1901, p. 1521), and section 1 of the act of March 2, 1896, c. 39, 29 Stat. 42 (U. S. Comp. St. 1901, p. 1603). The former statute provides:

"That suits by the United States to vacate and annul any patent heretofore issued shall only be brought within five years from the passage of this act, and suits to vacate and annul patents hereafter issued shall only be brought within six years after the date of the issuance of such patents."

The provision is contained in "An act to repeal timber culture laws, and for other purposes," but, being general in its terms, would seem to include patents to railroad companies under grants thereto, as well as other patents issued by the government. The later statute declares:

"That suits by the United States to vacate and annul any patent to lands heretofore erroneously issued under a railroad or wagon road grant shall only be brought within five years from the passage of this act, and suits to vacate and annul patents hereafter issued shall only be brought within six

years after the date of the issuance of such patents, and the limitation of section eight of chapter five hundred and sixty-one of the acts of the second session of the Fifty-First Congress and amendments thereto is extended accordingly as to the patents herein referred to."

The two statutes read together put all patents, whether issued in pursuance of railroad grants or otherwise, in the same category, and suits by the government to cancel cannot be maintained except as thereby provided. But the plain answer to the objection is that this is not a suit to annul the patents issued under these grants. It reaches back of the patents; the purpose being to forfeit the entire grants, so far as the lands are now held by the railroad company, for failure to observe the condition requiring the company to sell to actual settlers. The patents are only evidentiary of the grant; it is the grant that confers title. If the grant is rendered subject to forfeiture for want of the observance of a condition subsequent, the breach whereof may have occurred later than the issuance of many patents, it does not appeal to reason that the forfeiture should be defeated because suits were not instituted to annul the patents within the time fixed by the statute. Should the grant be annulled, the annulment would carry with it, it is true, the avoidance of the patents. But the conditions of the grant must be read into the patents, so the patents cannot stand in the way of the enforcement of such conditions.

The cause which forms the basis of this suit arises out of none of the facts adjudicated by the Land Department, or with which that department had anything to do in issuing the patents; but it arises from the alleged want of the observance of the terms of the grant, whereby the grant itself, it is alleged, has been forfeited. The patents add nothing to the terms of the grant, nor take aught from them. So I conclude that the government has not waived its right to maintain this suit for any of the reasons assigned. Nor is it barred of its remedy by virtue of the statutes of limitation relied upon by counsel.

The crucial controversy attending this cause relates to the true intendment of Congress as expressed by the clause contained in the amendment of April 10, 1869, referred to as the "actual settlers" proviso, as follows:

"And provided further, that the lands granted by the act aforesaid shall be sold to actual settlers only, in quantities not greater than one-quarter section to one purchaser, and for a price not exceeding two dollars and fifty cents per acre."

The government contends that this is a condition subsequent, subjoined to the original act, the effect of which is to entail a forfeiture of the lands granted for nonobservance of the condition. The defendants the railroad companies and Stephen T. Gage contend that it is neither a condition subsequent, an enforceable covenant, nor a trust obligation; it being urged that it is an "unenforceable regulative, directive covenant," leaving it wholly to the good faith and discretion of the grantee whether to observe its terms or not.

Reference to some of the plain rules of statutory interpretation will aid in the solution of the problem. It is axiomatic that the intent of Congress, as a first principle, should be ascertained and enforced.

"These grants," says the Supreme Court, "are to receive such a construction as will carry out the intent of Congress, however difficult it might be to give full effect to the language used if the grants were by instruments of private conveyance." Winona & St. Peter R. R. Co. v. Barney, 113 U. S. 618, 625, 5 Sup. Ct. 606, 609 (28 L. Ed. 1109).

"There is a presumption," says the same court, "against a construction which would render a statute ineffective or inefficient or which would cause grave public injury or even inconvenience." Bird v. United States, 187 U. S. 118, 124, 23 Sup. Ct. 42, 44 (47 L. Ed. 100.)

"The first and most elementary rule of construction is that it is to be assumed that the words and phrases are used in their technical meaning if they have acquired one, and in their popular meaning if they have not, and that the phrases and sentences are to be construed according to the rules of grammar; and from this presumption it is not allowable to depart, unless adequate grounds are found, either in the context or in the consequences which would result from the literal interpretation, for concluding that that interpretation does not give the real intention of the Legislature." Endlich on the Interpretation of Statutes, p. 4, § 2.

In application of this rule the court says, in McCluskey v. Cromwell, 11 N. Y. 601:

"If the words are free from ambiguity and doubt, and express plainly, clearly, and distinctly the sense of the framers of the instrument, there is no occasion to resort to other means of interpretation. It is not allowable to interpret what has no need of interpretation."

And so in United States v. Goldenberg, 168 U. S. 95, 102, 18 Sup. Ct. 3, 4 (42 L. Ed. 394), Mr. Justice Brewer says:

"The primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he has used. He is presumed to know the meaning of words and the rules of grammar. The courts have no function of legislation, and simply seek to ascertain the will of the legislator. It is true there are cases in which the letter of the statute is not deemed controlling, but the cases are few and exceptional, and only arise when there are cogent reasons for believing that the letter does not fully and accurately disclose the intent. No mere omission, no mere failure to provide for contingencies, which it may seem wise to have specially provided for, justify any judicial addition to the language of the statute."

In further elucidation, "The province of construction," says the court in Hamilton v. Rathbone, 175 U. S. 414, 421, 20 Sup. Ct. 155, 158 (44 L. Ed. 219), "lies wholly within the domain of ambiguity." And in another case (Kohlsaat v. Murphy, 96 U. S. 153, 160, 24 L. Ed. 844) that:

"The controlling rule of decision in applying the statute in any particular case is that, whenever the intention of the Legislature can be discovered from the words employed, in view of the subject-matter and the surrounding circumstances, it ought to prevail, unless it lead to absurd and irrational conclusions, which should never be imputed to the Legislature, except when the language employed will admit of no other signification."

Another plain rule of interpretation is that the purposes of the act must be gathered from the context and a survey of all its provisions, so that if possible it may stand as a harmonious and consistent whole, every word and sentence bearing an appropriate meaning and signification, rejecting none, unless leading to a manifest absurdity, which it must be presumed that the Legislature never intended. Rice v. Railroad Company, 1 Black, 358, 378, 17 L. Ed. 147; United States

v. Winn, 3 Sumn. 209, 211, Fed. Cas. No. 16,740; United States v. Bitty, 208 U. S. 393, 402, 28 Sup. Ct. 396, 52 L. Ed. 543.

Furthermore, interpretation must be had in the light of the conditions prevailing at the time of the enactment, and thus by standing in the place of the legislative body its intendment may be gathered by looking through its vision at the things as they then existed, and the probable exigencies that gave rise to the measure.

In Platt v. Union Pacific R. R. Co., 99 U. S. 48, 60, 25 L. Ed. 424, construing the Union Pacific land grant by act of 1862 (Act July 1, 1862, c. 120, 12 Stat. 489), the court says:

"All will concede * * * we are to look at the state of things then existing, and in the light then appearing seek for the purposes and objects of Congress in using the language it did. And we are to give such construction to that language, if possible, as will carry out the congressional intentions."

As stated by Mr. Justice Jackson, in Mobile & Ohio Railroad v. Tennessee, 153 U. S. 486, 502, 14 Sup. Ct. 968, 974 (38 L. Ed. 793):

"Legislative contracts, especially, should be read in the light of the public policy entertained, and the purposes sought to be accomplished at the time they were made, rather than at a later period when different ideas and theories may prevail."

Other citations to this purpose are unnecessary. I shall later point out some of the attendant and inducing conditions, including the policy and purposes of the government pertaining to railway grants and donation and sale of the public domain to private settlers, leading in all probability to the legislation in controversy.

[10] In the case of legislative grants, imposing conditions along therewith upon the grantee in relation to the thing granted, the acts conferring them are to be construed as laws, and the technical rules governing the interpretation of contracts are inapplicable; the single inquiry being as to the intent of the one party—the legislative intendment in promulgating the law.

Says the court, in Schulenberg v. Harriman, 21 Wall. 44, 62, 22 L. Ed. 551:

"A legislative grant operates as a law as well as a transfer of the property, and has such force as the intent of the Legislature requires."

So in Missouri, etc., Ry. Co. v. Kan. Pac. Ry. Co., 97 U. S. 491, 497, 24 L. Ed. 1095:

"It is always to be borne in mind, in construing a congressional grant, that the act by which it is made is a law as well as a conveyance, and that such effect must be given to it as will carry out the intent of Congress. That intent should not be defeated by applying to the grant the rules of the common law, which are properly applicable only to transfers between private parties."

Mr. Justice Brewer, sitting in the Circuit Court, states the rule concisely, yet comprehensively, thus:

"All legislative land grants are to be regarded, not merely as contracts, but also as laws. As such, they are subject to the same rules of interpretation that govern other laws, and a primary rule is that the intent of the legislator is to be sought, and, when ascertained, controls. The technical rules which govern the interpretation of private contracts must always yield

to the single inquiry of the intent of the one party—the Legislature." St. Paul, M. & M. R. Co. v. Greenalgh (C. C.) 26 Fed. 563, 568.

See, also, Platt v. Union Pacific R. R. Co., 99 U. S. 48, 25 L. Ed. 424; Hall v. Russell, 101 U. S. 503, 509, 25 L. Ed. 829; Johnson v. Ballou, 28 Mich. 379.

[11] And still another rule of construction as it pertains to grants of the public domain to private individuals or corporations is that they should, where there is ambiguity or uncertainty, be construed most favorably to the government, thus devolving upon the grantee, in whatsoever claim he seeks to maintain against the government relative to the grant, to show a right clearly defined and about which there can be no controversy or contention. Mr. Justice Harlan, in Sioux City, etc., Railroad v. United States, 159 U. S. 349, 360, 16 Sup. Ct. 17, 21 (40 L. Ed. 177), states the principle thus:

"If the terms of an act of Congress, granting public lands, 'admit of different meanings, one of extension and the other of limitation, they must be accepted in a sense favorable to the grantor. And, if rights claimed under the government be set up against it, they must be so clearly defined that there can be no question of the purpose of Congress to confer them.' Leavenworth, etc., Railroad v. United States, 92 U. S. 733, 740 [23 L. Ed. 634]."

Mr. Justice Field earlier stated the same principle in Slidell v. Grandjean, 111 U. S. 412, 437, 4 Sup. Ct. 475, 487 (28 L. Ed. 321):

"It is also a familiar rule of construction that where a statute operates as a grant of public property to an individual, or the relinquishment of a public interest, and there is a doubt as to the meaning of its terms, or as to its general purpose, that construction should be adopted which will support the claim of the government rather than that of the individual. Nothing can be inferred against the state."

Mr. Justice Harlan makes use of this explicit and significant language in Water Company v. Knoxville, 200 U. S. 22, 33, 26 Sup. Ct. 224, 227 (50 L. Ed. 353):

"The universal rule in doubtful cases, this court said in Oregon Railway Co. v. Oregonian Ry. Co., 130 U. S. 1, 26 [9 Sup. Ct. 409, 32 L. Ed. 837, 842], is that 'the construction shall be against the grantee and in favor of the government.' As late as Coosaw Mining Co. v. South Carolina, 144 U. S. 550, 562 [12 Sup. Ct. 689, 691],[1] this court said: 'The doctrine is firmly established that only that which is granted in clear and explicit terms passes by a grant of property, franchises, or privileges in which the government or the public has an interest. Statutory grants of that character are to be construed strictly in favor of the public, and whatever is not unequivocally granted is withheld; nothing passes by mere implication.' "

And so it was held in that case.

See, further, Hannibal, etc., Railroad Co. v. Packet Co., 125 U. S. 260, 271, 8 Sup. Ct. 874, 31 L. Ed. 731; Barden v. Northern Pacific Railroad, 154 U. S. 288, 325, 14 Sup. Ct. 1030, 38 L. Ed. 992; United States v. Oregon, etc., Railroad, 164 U. S. 526, 539, 17 Sup. Ct. 165, 41 L. Ed. 541; Northern Pacific Railway v. Soderberg, 188 U. S. 526, 534, 23 Sup. Ct. 365, 47 L. Ed. 575; Cleveland Electric Ry. Co. v. Cleveland, 204 U. S. 116, 27 Sup. Ct. 202, 51 L. Ed. 399.

Some inquiry now relative to the conditions existing at the time these grants were made, and the history, policy, and purposes of the general government in its control, administration, and disposition of the public domain.

[1] 36 L. Ed. 537.

In the early annals of the United States the public lands were regarded largely as an asset out of which to derive revenue for the needs of the government. At one time the domain was pledged to the payment of the public debt. The earlier policy was to dispose of these lands to private purchasers, both at public and private sale, but for as much as could be had, and thus to increase the revenues of the government. Such was the central thought. It may have contemplated that purchasers of large tracts would themselves subdivide their holdings, by disposition to persons desiring to establish homes, and that the lands would eventually be devoted to the needs of the settler. But that was subordinate to the main purpose. Lands once offered at public auction, when no purchaser was secured, became what was known as "offered lands," or lands subject to private entry. These offered lands could thereafter be purchased at the minimum price, being the price fixed below which the government would not consent that they should be bid in at auction. Through this regulation, purchasers at private entry were enabled to acquire such tracts of land as they were able to pay for, for home or other purposes. They could acquire no other lands from the government except those that had been previously offered at public auction and failed of a purchaser at a price equal to the minimum or above. Even settlement upon the public domain was discouraged; Congress believing that satisfactory disposition thereof might otherwise be more readily and expeditiously accomplished. Notwithstanding, there was constant and increasing encroachment upon the public domain, and many persons made settlement upon tracts of land of their own selection, cultivating and improving them, and thus fitting and designing them for homes and permanent residence. Based upon such settlement, cultivation, and improvement, and by virtue of being the first appropriators, the settlers began to put forth claims to the first right to purchase the tracts involved from the government, that they might acquire the ultimate title thereto. Later Congress recognized these claims of right; first in a small way, that is, confining its recognition to settlers in certain localities, and limiting its relief in matter of time. The idea grew, however, until Congress was induced to adopt a general pre-emption law authorizing the entry of lands surveyed, but not open to private entry, as well as of lands which could be bought at private sale. In illustration of the development of the policy, it was enacted May 29, 1830 (Act May 29, 1830, c. 208, 4 Stat. 420, 421):

"That every settler or occupant of the public lands, prior to the passage of this act, who is now in possession, and cultivated any part thereof in the year 1829, shall be, and he is hereby, authorized to enter * * * any number of acres, not more than one hundred and sixty or a quarter section, to include his improvement, upon paying to the United States the then minimum price of said land."

On April 5, 1832, another statute was passed. (Act April 5, 1832, c. 65, 4 Stat. 503), declaring:

"That all actual settlers, being housekeepers upon the public lands, shall have the right of pre-emption to enter, within six months after the passage of this act, not exceeding the quantity of one-quarter section."

Where, by reason of the public surveys not having been made, the settlers were unable to describe their entries, the privileges thus granted were extended by acts of July 14, 1832 (Act July 14. 1832, c. 246, 4 Stat. 603), and March 2, 1833 (Act March 2, 1833, c. 92, 4 Stat. 663), for a period of one year after the surveys should be made. These pre-emption acts were revived by act of June 19, 1834 (chapter 54, 4 Stat. 678), and again by act of June 22, 1838 (chapter 119, 5 Stat. 251), and later still by act of June 1, 1840 (chapter 32, 5 Stat. 382). But on September 4, 1841 (Act Sept. 4, 1841, c. 16, § 10, 5 Stat. 455), a general pre-emption statute was enacted extending the benefits of settlement without restriction as to time, and providing that, from and after the passage of the act, every person as therein designated, being the head of a family, etc., who since the 1st day of June, 1840, had made or should thereafter make settlement in person on the public lands, which had been surveyed prior thereto, and who should inhabit and improve the same and erect a dwelling thereon, was authorized to enter, in the proper land office, any number of acres of such land, to include the residence of the claimant, not exceeding 160 acres, by payment to the United States of the minimum price of such land. This statute expressly authorized any person possessing the qualifications designated to make settlement upon any lands of the government domain that had theretofore been surveyed. Prior thereto the government had been adopting legislation designed to legalize what was treated rather as a trespass upon the government's domain than as an entry and occupation by right, license, or privilege. Now the entry is directly permitted, and not only this, but settlement is invited, by throwing open the surveyed portions of the public domain for that express purpose. Says the court in Clements v. Warner, 24 How. 394, 397, 16 L. Ed. 695:

"Later statutes enlarged the privilege (of pre-emption), so as to embrace lands not subject to sale or entry, and clearly evince that the actual settler is the most favored of the entire class of purchasers."

This case was decided in 1860. In the meanwhile the trend of public thought was toward even greater liberality as it concerned the settler. The public domain was fast coming to be regarded, not as a property—a mere asset from which to derive revenue for the government's current needs, or with which to discharge its obligations—but as a vast domain, which in large measure should be devoted to the settlement and habitation of its citizens, and that those willing to venture out into the frontier and there provide homes for themselves, and thus establish communities and build up the country, were primarily deserving of the nation's bounty. So the sentiment grew favorable to donating outright small tracts of the public lands to such of the citizens, present and prospective, of the government as would be willing to make settlement thereon, and show good faith in their purpose to make of such lands their permanent homes by living thereon and improving the same. Ultimately, May 20, 1862 (Act May 20, 1862, c. 75, 12 Stat. 392), Congress adopted the homestead law, which donates to those who desire to take advantage of its provisions 160 acres of public land, without cost except the fees attending the filings

and proofs in the land office, on condition only that they reside upon and cultivate the same for a period of five years. This law grew rapidly in favor, and soon became firmly established in public confidence and esteem as wise and justly beneficent.

It was not until early in the nineteenth century that Congress began the appropriation of public lands in aid of internal improvements. First the appropriations were of a certain proportion of the proceeds arising from sales of the land; but later they were of the land itself, which in the earlier stages was devoted to the construction of canals, river improvements, and wagon roads. This was followed by appropriations to aid in the construction of railroads. The grants were made first to the states, to be by them devoted to the ultimate purposes designed; but following a considerable time later grants were made to railroad corporations incorporated by act of Congress, and then to a few private corporations. During the fifties, and up to within the year 1866, numerous grants were made to states, covering many millions of acres, in aid of the construction of railroads. Most of these were similar in the manner of disposing of the lands; the states being made the intermediary through which the title was to pass, to insure good faith on the part of the railroad companies ultimately to receive the benefits. Generally the grants were of lands not sold, reserved, or otherwise disposed of. Later acts excluded lands also to which a pre-emption claim or right of homestead settlement had attached, and such as were in the occupancy of bona fide settlers. On July 1, 1862, Congress made a departure by granting lands to a company of its own incorporation, as well as to privately incorporated concerns under general state laws. I refer to the act creating the Union Pacific Railroad Company and the grant of lands thereto in aid of the construction of its road, including grants to some private corporations. Other grants were made to federal corporations, namely, one in 1864, another in 1866, and still another in 1871, being the last of all the grants made by Congress in aid of the construction of railroads. Some other grants to private corporations followed those provided for along with the Union Pacific grant, and among them the grants of lands under consideration here.

The earlier grants were attended with a doubling of the minimum price of lands within the railroad limits, that is, within the exterior boundaries of the grant not covered by it, but required that such lands be offered at public sale before they were subjected to private entry even at that price. But beginning with the Northern Pacific grant of July 1, 1864, the minimum price was doubled, and private entry was permitted upon such lands whether previously offered or not. Commencing with 1866 the provision was again readjusted, permitting the settler to make entry under the pre-emption act, at the price existing at the time of settlement, and of 80 acres under the regulations of the homestead act. The grants of 1869, as will be seen by the acts now under consideration, annexed provisions requiring the lands granted to be disposed of to actual settlers, in quantities not greater than one quarter section and at a price not above $2.50 per acre. This policy was subsequently adhered to. This latter class of

provisions was the outgrowth of a widespread and persistent agitation among the people of the nation against the further granting of large areas in aid of railroad construction; it being urged that what remained of the public domain should be set apart for occupancy and acquirement by actual settlers and home seekers, with the privilege and right of acquiring small quantities of land in their own right. The appeal was made as a "measure of justice to the whole American people, as a rich legacy in trust" to the generation then existing and for those to come after, "never to be alienated." The legislation that followed was largely indicative of the reflex of public opinion pertaining to the subject.

Some allusion to the discussions in Congress immediately prior to and at the time these provisions were, incorporated, with the legislation making grants of public lands to railroad corporations, will not, I think, prove uninstructive; not that what members may have said while the bills were under consideration should be taken as characterizing the legislative intendment in adopting them, but as shedding light upon the conditions, historically, then attending the trend of public thought, and the vital need of such legislation to meet the public exigencies.

The idea was first advanced that, whenever it could be done, the lands proposed to be granted for railroad purposes should be set apart to the states in which they were situated, to be held in trust by them, to be disposed of to actual settlers only, with limitation as to acreage and a maximum price. Then it was urged that such granted lands should be administered by the Secretary of the Interior. This later idea came from Mr. Lawrence, of the House, by way of an amendment to the Denver Pacific bill, as follows:

"And be it further enacted, that all lands which may be granted or conveyed under or by virtue of this act or the acts relating to said railroad company, shall be sold only to actual settlers in quantities not exceeding one quarter section to any one person, and at a price not exceeding $2.50 an acre; and the Secretary of the Interior shall have power to prescribe rules and regulations for carrying this section into effect."

This was defeated. The discussion drifted to another plan, embodied in an amendment offered by Mr. Julian, also of the House, as follows:

"Provided, that the lands granted * * * shall be sold to actual settlers only, in quantities not greater than one hundred and sixty acres to one purchaser, and for a price not exceeding $2.50 per acre."

Speaking to the amendment, Mr. Julian had this to say:

"Under proper restrictions I would grant them public lands, and this House has already decided that those restrictions shall be such as I have proposed in the amendment I offered to this bill the other day, namely, that the lands shall be granted on the express condition that they shall be sold to actual settlers only, in quantities not greater than one quarter section to one purchaser, and for a price not exceeding $2.50 per acre. This will avoid the complete monopoly of the lands, as sanctioned by the old system of land grants, and at the same time devote to settlement and tillage the odd-numbered sections granted, while creating in this way established communities and a local business along the line of the road. This, sir, is the true policy, and the whole land grant system of our country will be repudiated by the

people. and ought to be repudiated, unless it shall be made to conform to the conditions I have stated."

Another plan was proposed by Mr. Logan, namely, that all lands theretofore granted to aid in the construction of railroads along that portion then unfinished should be subject to entry at the government land office at $2.50 per acre; the money to be deposited in the Treasury of the United States as a sinking fund for the redemption or purchase of the bonds of the company so far as it might be sufficient therefor. Mr. Lawrence's plan was, in effect, to make the railroad company the trustee of the lands, with administration by the Secretary of the Interior. Mr. Logan's plan was to make the government trustee, as well as to subject the corpus of the estate to administration through its proper Land Department. Mr. Julian's amendment prevailed finally, and such in effect, by later enactment, became the law attending the grants in question. Other grants took this form of legislation in the main. I speak specifically of the Coos Bay Wagon Road grant of March 3, 1869 (Act March 3, 1869, c. 150, 15 Stat. 340); a revival of grant to the state of Alabama in aid of the construction of railroads (Act April 10, 1869, c. 24, 16 Stat. 45); and an act extending the time for the construction of a railroad under grant to the states of Missouri and Arkansas. As to this latter grant the amendment was subsequently repealed.

The discussion along the line was varied, and the opinions of members of the two Houses of Congress did not agree as to the effect of the clause. Senator Vickers was of the view that the grant was made "expressly on condition that the lands are to be sold to actual settlers"; that:

"If the lands are sold to actual settlers, there is no forfeiture. If a portion of the land is sold to actual settlers, the portion unsold will be forfeited to the government, if that condition is violated."

Senator Thurman was doubtful whether the provision would be effective, and suggested, as it then occurred to him, that Congress could not ingraft upon the grant a condition or a trust or a covenant of that kind in that indefinite and general way. Senator Williams, of Oregon, said:

"The lands granted are as open, under the provisions of this bill, to actual settlers as they are under the pre-emption laws of the country. It simply provides that when settlers go upon these lands they may buy them of the company, and the proceeds shall be applied to assist in the construction of the road."

Senators Stewart and Casserly agreed with him in this veiw.

With this abbreviated review of the conditions and of the policy of the government with reference to the public domain obtaining prior to and at the time of the adoption of the measures in question, we may proceed to the further discussion of the legislative intendment, considered from a legal standpoint, under the authorities.

There can be no two opinions about the literal meaning of the proviso. The language is so plain and explicit that it bears absolute impress upon the understanding. It constitutes a declaration that the granted lands shall be sold to actual settlers only, in quantities not

greater than one quarter section, etc., which is easily comprehensible, and it would seem that a simple duty or obligation was imposed, so simple that any one could, without taking further thought, readily discharge it. But the real question is: Are these provisions couched in such legal terms as to render them enforceable according to their letter and spirit? In other words, can the grantee be required to do what the language plainly directs shall be done; and what penalty, if any, is entailed by a failure or refusal to observe the plain wording of the provisos?

An estate upon condition is defined as—

"one which has a qualification annexed, by which, on the happening of a particular event, it may be created, enlarged, or destroyed. If set forth, the condition is express; and if it allows the estate to vest, and then to be defeated in consequence of nonobservance of the requirement, it is a condition subsequent." Blanchard v. D., L. & L. M. R. R. Co., 31 Mich. 43, 48, 18 Am. Rep. 142.

Some general observations concerning conditions subsequent may be made in passing. They are not favored in law, and ordinarily are amenable to strict construction, for the reason that, if not observed according to their tenor, they entail forfeiture and a destruction of the estate. A mere declaration touching the particular purposes for which the grant is made, or that the grantee is to do or not to do certain things, will not evidence a condition. And, generally speaking, a condition in a grant should be created by apt and appropriate words—words which ex proprio vigore import a condition. Furthermore, if there be doubt as to whether the words create a condition subsequent, or a covenant, the breach of which may be compensated in damages, courts will construe them favorably to the latter. Instances are not wanting, however, where words and terms appropriate to create a condition, when read in connection with the context of the grant and the intention of the parties, have been disregarded in their technical sense, and construed as in harmony with a covenant, and, conversely, the decision depending upon the real purpose and intent of the parties to the grant, as gathered from the manner and purpose of the conveyance and from the instrument itself, read in its entirety. And it has been held that, although a deed or conveyance contain a clause declaring the purpose for which it is intended the granted premises shall be used, if such purpose will not inure specially to the benefit of the grantor, but is in its nature general and public, and if there are no words in the grant indicating an intent that the grant is to be void if the declared purpose is not fulfilled, such a clause is not a condition subsequent. 11 Cyc. 1050; Raley v. Umatilla County, 15 Or. 172, 13 Pac. 612, 3 Am. St. Rep. 139; Gilbert v. Peteler, 38 N. Y. 165, 97 Am. Dec. 785; Rawson v. Inhabitants of School District No. 5 in Uxbridge, 7 Allen (Mass.) 125, 83 Am. Dec. 670.

Recurring to the old law, which comes down to us as sound to-day as it was then, Sheppard's Touchstone (8th Ed.) 121, has this upon the subject:

"Conditions annexed to estates are sometimes so placed and confounded amongst covenants, sometimes so ambiguously drawn, and at all times have in their drawing so much affinity with limitations, that it is hard to discern

and distinguish them. Know therefore that for the most part conditions have conditional words in their frontispiece, and do begin therewith; and that amongst these words there are three words that are most proper, which in and of their own nature and efficacy, without any addition of other words of re-entry in the conclusion of the condition, do make the estate conditional, as proviso, ita quod, and sub conditione. And therefore if A. grant lands to B. to have and to hold to him and his heirs, provided that, or so as, or under this condition, that B. do pay to A. ten pounds at Easter next; this is a good condition, and the estate is conditional without any more words. But there are other words, as si, si contingat, and the like, that will make an estate conditional also, but then they must have other words joined with them, and added to them in the close of the condition. as that then the grantor shall re-enter, or that then the estate shall be void, or the like. And therefore if A. grant lands to B. to have and to hold to him and his heirs, and if, or but if it happen, the said B. do not pay to A. ten pounds at Easter, without more words, this is no good condition; but if these or such like words be added, that then it shall be lawful for A. to re-enter, then it will be a good condition.

"But here note that these words proviso, ita quod, and sub conditione, albeit they be the most proper words to make conditions, yet do they not always make the estate by the deed to be conditional, but sometimes do serve for other purposes; for the word proviso hath divers operations. besides; for sometimes it doth serve for and work a qualification, or limitation, and sometimes it doth serve to make and work a covenant only. And then only (being inserted amongst the covenants of the deed) it doth make the estate conditional, when there are these things in the case: (1) When the clause wherein it is hath no dependence upon any other sentence in the deed, nor doth participate with it, but stands originally by and of itself; (2) when it is compulsory to the feoffee, donee, etc.; (3) when it comes on the part, and by the words of the feoffor, donor, lessor, etc.; (4) when it is applied to the estate, and not to some other matter."

A few modern cases will illustrate the significance given technical words appropriate to the creation of a condition, and when their technical sense will be disregarded; also, when a condition will be declared even where no technical words adapted to its creation attend it.

In Gray v. Blanchard, 8 Pick. (Mass.) 285, a deed contained the following provision:

"Provided, however, this conveyance is upon the condition, that no windows shall be placed in the north wall of the house aforesaid, or of any house to be erected on the premises, within thirty years from the date hereof."

It was objected to this conveyance that the words quoted did not constitute a condition, but evidenced a covenant only. Answering this objection, the court, speaking through Parker, Chief Justice, says:

"The words are apt to create a condition; there is no ambiguity, no room for construction; and they cannot be distorted so as to convey a different sense from that which was palpably the intent of the parties. The word 'provided,' alone, may constitute a condition; but here the very term is used which is often implied from the use of other terms. This conveyance is upon the condition' can mean nothing more nor less than their natural import; and we cannot help the folly of parties who consent to take estates upon onerous conditions, by converting conditions into covenants. It would be quite as well to say that the words mean nothing, and so ought to be rejected altogether. No authority has been cited which bears out this suggestion; indeed, the authorities are all against it."

It was further insisted that, because there was no clause of re-entry for breach of condition in the deed, the provision was not strictly a

condition going to the forfeiture of the estate; but the court here also held to the contrary, saying:

"The law seems to be clear the other way. A clause of re-entry is not necessary to make a condition. Proviso, ita quod, sub conditione, make the estate conditional. Com. Dig. Condition, A 2. Other words, such as si, si contingat, do not make a condition, which will work a forfeiture, without clause of re-entry. Lit. § 331; Shep. Touch. 121."

In the case of Hooper v. Cummings, 45 Me. 359, it appears that one Jonathan Cummings conveyed to Nathan Woodbury and others, a committee appointed to build a meetinghouse in the town, certain acreage, and that in the deed, succeeding the covenants, were these words: "Providing the said committee and proprietors fence the said land and keep the same in repair." Deciding as to the effect of these words, the court says:

"We may assume that the proviso in the deed created a condition subsequent, and, in this, we are sustained by most, if not all, the authorities, ancient and modern; notwithstanding it is to be construed strictly and most strongly against the grantor to prevent, if possible, a forfeiture of the estate. 'If the word proviso be the. speaking of the grantor, feoffor, donor, etc., and obliges the grantee, etc., to any act, it makes a condition, in whatever part of the deed it stands; and, though there be covenants before or after, is not material.' 3 Com. Dig. 84 (Condition)."

Sharon Iron Co. v. City of Erie, 41 Pa. 341, is a case where the city of Erie conveyed by deed a piece of realty to the Sharon Iron Company, subject to the conditions, provisions, and stipulations of certain resolutions. These resolutions provided:

"First. That the alienees shall, 'within one year, erect a breakwater in front of each of said lots, under the direction of the city councils.' Second. That they shall, 'within two years, erect a good and substantial bloomery thereon, or within the limits of the city.'"

It being alleged that the iron company had failed to comply with these provisions, the city brought ejectment to recover the lots. The bloomery was not constructed as required by the resolutions, and the question came up as to whether the grantees had not forfeited the property by reason of the nonobservance of the condition. Speaking to that subject, the court says:

"The clause in the original resolution incorporated into the deed was a condition, not a covenant, and 'where the language imports a condition merely, and there are no words importing an agreement, it cannot be enforced as a covenant, but the only remedy is through a forfeiture of the estate' "--quoting from Selden, J., in Palmer v. Ft. Plain & Cooperstown Plank Road Company, 11 N. Y. 389.

In Wilson et ux. v. Wilson, 86 Ind. 472, a deed was executed by father to son upon the consideration of a certain covenant contained in a separate instrument executed by the son. Upon these facts it was held that the deed was upon condition; the court saying:

"There was no other valuable consideration for the deed, and, unless the instrument can operate as a defeasance, it is difficult to see how, in respect to some, at least, of its terms, it could be enforced, or be made effective in any way. It may be said that the covenants contained in the writing are personal covenants merely, but that cannot affect the conclusion that the deed was made on condition that they be faithfully kept and performed."

In Oliver Hayden et al. v. Inhabitants of Stoughton, 5 Pick. (Mass.) 528, a devise of real estate to a town for the purpose of building a schoolhouse, "provided it is built within 100 rods of the place where the meetinghouse now stands," was held to be upon a condition subsequent.

Says Lyon, Judge, in Horner v. Chicago, Milwaukee & St. Paul Railway Co. et al., 38 Wis. 165, 173:

"Although there are technical words, which, if used in a conveyance, unmistakably create a condition, yet the use thereof is not absolutely essential to that end, and a valid condition may be expressed without employing those words."

And again:

"It is not essential to a valid condition that, in case of a breach thereof, a right of re-entry be expressly reserved in the deed, or that it be expressed therein that the estate of the grantee shall terminate with a breach of the condition."

This was a case where the deed conveyed two parcels of land. After the description of the first parcel, and referring to it by the words, "the aforesaid piece or parcel of land hereby conveyed to the party of the second part only for depot and other railroad purposes," and after description of the other parcel, which in terms is granted for a railway, the deed contains these words: "Both of said pieces or parcels being granted solely for said road purposes." The court, speaking with reference to these clauses, says:

"The words 'only' and 'solely' are words of restriction or exclusion. As used in this deed, their effect clearly is to prohibit the grantee from using the lands for any other than the specified purposes."

So it was said by Page, J., in Kilpatrick v. Mayor of Baltimore, 81 Md. 192, 31 Atl. 806, 27 L. R. A. 643, 48 Am. St. Rep. 509, 511:

"Technical words are not absolutely essential to create a condition, nor on the other hand does their use necessarily raise one; such words may be controlled by the context of the instrument in which they are used, so that sometimes they work a limitation and condition, and sometimes a covenant or a trust only."

In this case the deed was to the "mayor and city council of Baltimore and its successors," with habendum "to have and to hold * * * unto the mayor," etc., "forever, as and for a street to be kept as a public highway." And it was held not to have been made upon condition.

Lurton, Circuit Judge, now a Justice of the Supreme Court of the United States, gave utterance to the principle in Board of Commissioners v. Young, 59 Fed. 96, 104, 8 C. C. A. 27. The deed under consideration contained neither technical words importing a conditional estate, nor any clause of re-entry. "Yet," says the distinguished jurist, "a condition subsequent may be so strongly and clearly implied from the whole tenor of the deed as to demand recognition, though not expressed in technical language." The deed in that case, however, was ultimately held not to have been executed upon condition.

In Stanley v. Colt, 5 Wall. 119, 166, 18 L. Ed. 502, the court says:

"It is true that the word 'proviso' is an appropriate one to constitute a common-law condition in a deed or will, but this is not the fixed and invariable meaning attached to it by the law in these instruments. On the contrary, it gives way to the intent of the parties as gathered from an examination of the whole instrument, and has frequently been thus explained and applied as expressing simply a covenant or limitation in trust."

Again, in Atlantic & Pacific Railroad v. Mingus, 165 U. S. 413, 428, 17 Sup. Ct. 348, 351 (41 L. Ed. 770), Mr. Justice Brown says:

"It cannot be supposed that Congress intended to vest a title in the railway company to this enormous grant of lands without contemplating that the government might in some way reacquire it in case of a failure of the company to comply with the conditions of the grant. No express provision for a forfeiture was required to fix the rights of the government. If an estate be granted upon a condition subsequent, no express words of forfeiture or reinvestiture of title are necessary to authorize the grantor to re-enter in case of a breach of such conditions."

It is not unusual for the crown or the government to annex conditions subsequent to grants, and such grants are subject to forfeiture for failure to observe the conditions imposed, as private grants may be forfeited unless the breach is subsequently waived by act of the grantor. United States v. Arredondo, 6 Pet. 691, 8 L. Ed. 547; United States v. Wiggins, 14 Pet. 334, 10 L. Ed. 481; United States v. De Repentigny, 5 Wall. 211, 18 L. Ed. 627.

Indeed, it is a thing quite common in some form attending grants in aid of railroads and other internal improvements.

Two authorities may now be noted which have discussed conditions, one of similar import and the other identical with these under consideration. The first is Nichols v. Southern Oregon Co. (C. C.) 135 Fed. 232, a case decided in this court. By act of March 3, 1869 (chapter 50, 15 Stat. 340), a grant of lands was made to the state of Oregon in aid of the construction of a military wagon road, containing the following provision:

"Provided, further, that the grant of land hereby made shall be upon the condition that the lands shall be sold to any one person only in quantities not greater than one quarter section, and at a price not exceeding $2.50 per acre."

The defendant company succeeded to a portion of these lands, and the plaintiff sued to require it to convey to him a tract of 160 acres, after tendering the price thereof at the rate of $2.50 per acre, claiming that under the clause above quoted he was so entitled to purchase the land, and that the defendant was obligated to convey to him. Judge Bellinger, in disposing of the controversy, says:

"The grant was not a law for the sale of the granted lands. It did not offer them for sale. That was left to the state, subject to restrictions as to the price at which they should be sold and the quantity that should be sold to any one person. These restrictions were mere incidents of the grant, mere regulations that the state was required to observe in selling the granted lands, at such time after they were earned as the state should conclude to sell them. The object to be accomplished in no wise depended upon them. Whatever rights existed in respect to these restrictions belonged to the United States. No interest was created in the complainant. He is not a beneficiary in the grant, and he has no standing to complain that the state

has violated its conditions in the manner in which it has disposed of the granted lands. That is a matter that can only be taken advantage of by the United States. Furthermore, above 30 years ago Congress authorized patents to issue to the state or to any corporation or corporations to which it had transferred its interest, and patents have been issued to the state's grantees in pursuance of that law. It is not necessary to consider whether this act was a waiver by Congress of the conditions subsequent in the grant."

Three things seem to have been decided, namely: That the restrictions imposed by the clause quoted were mere incidents or regulations that the state was required to obey; that whatever rights vested in respect to such restrictions belonged to the United States; and that a third or outside party was not a beneficiary to the grant; and, incidentally, the conditions are spoken of as "conditions subsequent."

The other case is Warrior River Coal & Land Company v. Alabama State Land Company, 154 Ala. 135, 45 South. 53. The action was in ejectment, and involved a tract of land included in a grant by Congress to the state to aid in the construction of railroads. The grant, which was made by act of June 3, 1856 (chapter 41, 11 Stat. 17), seems to have lapsed in part, and a revival was accorded by act of April 10, 1869 (chapter 24, 16 Stat. 45), containing a clause identical with the one here under consideration amendatory of the act of July 25, 1866. Speaking with reference to the clause, the court says:

"The legal title to the granted lands having vested in the state, and the beneficial interest in the railroad company having become individualized as to the land and the companies, respectively, the land here in controversy included, by the performance of all conditions precedent erected by the national grant, the limitation quoted from the act was, at most, a condition subsequent, a violation of which rendered the estate in the particular instance amenable to forfeiture by the appropriate action of the granting government, and by that only."

There is here the intimation that the clause might create a condition subsequent, but that, if it did, the court was of the view that the forfeiture could be insisted upon only by the general government.

Without for the present concluding whether the provisions in question constitute a condition subsequent, the logical order requires that we first determine the contentions of cross-complainants and interveners.

[12] The position of cross-complainants is that these provisions— the settlers clause—devolved upon the grantee an executory trust to be administered by it, and that when any citizen, qualified to take and hold lands in his own right, became an actual settler upon the land selected by him, he then became qualified as a cestui que trust, to whom the grantee was bound to sell at the rate of $2.50 per acre, and in due time to convey, and that equity will interpose its jurisdiction to enforce the trust. Under this theory, it is further asserted that it makes no difference that a cestui que trust was not in being and qualified as such at the time of the grant, but that the act has in contemplation any such qualified person, who may at any time make settlement and, with a tender of the purchase price, demand a deed.

A word as to the signification of the term "covenant," before proceeding to the inquiry thus suggested. It is:

"An agreement between two or more persons, entered into by deed, whereby one of the parties promises the performance or nonperformance of certain acts, or that a given state of things does or shall, or does not or shall not, exist." Bouvier's Law Dictionary.

In common parlance, however, the term is applied to any agreement whether under seal or not." 11 Cyc. 1043.

No specific or technical words are necessary to the creation of a covenant, nor is any particular or set form of expression; it being sufficient if, from the whole agreement, there appears upon any part of it an obligation or undertaking to do or not to do a particular thing or things. As stated in Sheppard's Touchstone, 161:

"And there needs not in this case formal and orderly words, as covenant, promise, and the like, to make a covenant on which to ground an action of covenant; for a covenant may be had by any other words; and upon any part of an agreement in writing, in what words soever it be set down, for anything to be or not to be done, the party to or with whom the promise or agreement is made may have his action upon the breach of the agreement."

The case of Hale v. Finch, 104 U. S. 261, 26 L. Ed. 732, is instructive upon the subject. The controversy was relative to the proper construction of a bill of sale of a boat which recited that the sale was upon express condition, etc.; it being claimed that there was liability in covenant. The bill of sale was not signed by the vendee, nor was it necessary in the form in which it was drawn for him to sign it. The court, after observing that, "Words of proviso and condition will be construed into words of covenant, when such is the apparent intention and meaning of the parties," quoting from 2 Parsons, Contracts, 23; and that, "There are cases in which the instrument to be construed was held to contain both a condition and a covenant; as, 'If a man by indenture letteth lands for years, provided always, and it is covenanted and agreed between the said parties, that the lessee should not alien,'" which was adjudged to be "'a condition by force of the proviso, and a covenant by force of the other words,'" citing Co. Litt. 203b; and after further observing that there was in terms a covenant to defend the title of the boat, which was immediately followed by language implying an agreement that the sale was upon the express condition that neither the boat nor the machinery should be used within a prescribed time upon certain waters—held that, the vendor having expressly, and the vendee impliedly, agreed that the sale was upon an express condition stated in such form as to preclude the idea of personal responsibility upon the part of the vendee, effect should be given the intention thus distinctly declared, and hence that the writing created a condition and not a covenant.

In general a trust is:

"An obligation arising out of a confidence reposed in one who has the legal title to property conveyed to him, that he will faithfully apply and deal with such property according to the confidence reposed." 28 Am. & Eng. Enc. of Law, 858.

So:

"For the creation of a valid trust, three circumstances must concur: First, a definite subject-matter within the disposal of the settlor; second, a lawful definite object to which the subject-matter is to be devoted; third, clear and

unequivocal words or acts, devoting the subject-matter to the object of the trust." 28 Am. & Eng. Enc. of Law (2d Ed.) 865, 866.

But:

"The declaration of trust, whether written or oral, must be reasonably certain in its material terms; and this requisite of certainty includes the subject-matter or property embraced within the trust, the beneficiaries or persons in whose behalf it is created, the nature and quantity of interests which they are to have, and the manner in which the trust is to be performed. If the language is so vague, general, or equivocal, that any of these necessary elements of the trust is left in real uncertainty, then the trust must fail." 2 Pomeroy's Eq. Jur. § 1009.

As it is with a covenant or condition subsequent, no particular form of words is essential whereby to create a trust. It depends wholly upon the intention of the person who it is avowed has made the settlement, and the intention is to be ascertained also, as in the other forms of obligation or condition, from all the words attending the instrument by which the relationship is claimed to have been established. So the inclination of construction, where it is doubtful whether a trust has been created or a condition subsequent has been imposed, is toward the trust relationship.

As to the settlers clause, there is absolute certainty as it respects the subject-matter. It consists of the lands granted. But what is to be said of the beneficiaries, and of the nature and quality of interest each or any of them is to have?

It should be borne in mind that in most jurisdictions a marked and vital difference is maintained between ordinary and charitable trusts, as it pertains to the essentiality of the element of identity and certainty of the cestui que trust. Those jurisdictions which do not recognize the distinction hold that charitable trusts are governed, as it respects this element, by the same rules as are applicable to ordinary trusts. In the ordinary trust the cestuis que trust must not only be definitely and specifically designated so that there can ordinarily be no uncertainty as to their identity, but they must be capable of taking the estate or property which is the subject of the trust. They may not be in esse at the time of the creation of the trust; but there must not be uncertainty as to who is the beneficiary, whoever it may or shall be, whether he is in existence, or is to come into being at some future time. If there be a valuable consideration to support the trust, the courts are solicitous to enforce it, to subserve the interest of the parties; but if the cestui que trust is not named, or so designated that he cannot be identified, the courts are powerless to give effect to the trust, however clearly it may be created in other respects. Says the court in Levy v. Levy, 33 N. Y. 97, 107:

"If there be a single postulate of the common law, established by an unbroken line of decision, it is that a trust, without a certain beneficiary who can claim its enforcement, is void, whether good or bad, wise or unwise."

On the other hand, it is not at all essential either that the beneficiaries of a charitable trust or use be ascertained, or any definite number thereof, for indefiniteness is said to be a characteristic of a legal charity (Russell v. Allen, 107 U. S. 163, 2 Sup. Ct. 327, 27 L. Ed. 397),

or capable of taking the legal title to the estate bestowed in trust. Says Mr. Beach:

"In a private trust, if the beneficiary or beneficiaries are not definitely and positively named, the trust fails on account of indefiniteness. But, in a charitable trust, the beneficiaries need not be definitely named, and, even where there is no adequate designation of a cestui que trust, the trust will be enforced in equity if the intention of the settlor can be ascertained beyond a reasonable doubt." Beach on Trusts & Trustees, § 322.

See, further, section 55, same work, and sections 66, 95, Perry on Trusts.

For emphasis of the essentiality respecting certainty as to the beneficiary, I will make further reference to the authorities, and in doing so will cite from some of the jurisdictions which do not recognize the distinction noted between the two classes of trusts. The force of the authorities is not weakened because the distinction is not observed. In Weaver v. Spurr, 56 W. Va. 95, 105, 48 S. E. 852, 856, it is said:

"There cannot be a trust without a cestui que trust; and, if it cannot be ascertained who the cestui que trust is, it is the same thing as if there was none."

In an earlier case from the same state (Brown v. Caldwell, 23 W. Va. 187, 48 Am. Rep. 376), a grant of land, upon trust that the trustee "shall at all times permit all the white religious societies of Christians and the members of such societies to use the land as a common burying ground and for no other purpose," was held to be void for want of certainty as to the beneficiaries. Speaking of this alleged trust, the court said:

"It is difficult to conceive of anything more vague, indefinite, and general in its character. The societies here designated are neither local nor fixed. They in fact embrace the whole Christian world, and are not only indefinite, but unascertainable."

In Stonestreet v. Doyle, 75 Va. 356, 40 Am. Rep. 731, a devise of land "to build a schoolhouse for the purpose of a free school, and further extending the education of poor children," was held inoperative and void for uncertainty as to the beneficiaries.

So it was held in Heiss, Executor, etc., v. Murphey et al., 40 Wis. 276, 292, that a devise "to the Roman Catholic orphans," and empowering the Roman Catholic Bishop to sell the property and "use the proceeds for the benefit of the Roman Catholic orphans," was void for uncertainty in the description of the beneficiaries; the court saying:

"There are no ascertainable beneficiaries, either as a class or individuals, and therefore the trust cannot be effectually carried out."

A bequest as follows: "I leave the whole of said fund in the hands of my executor, to be by him applied to the support of missionaries in India"—was held void in Board of Foreign Missions v. McMaster, Fed. Cas. No. 1,586, because of uncertainty as to beneficiaries; the court saying:

"But whether there be a competent trustee or not, if the cestui que trusts are not clearly ascertained by the will, the devise or bequest is void."

So a bequest "to some disposition thereof which my executors may consider as promising most to benefit the town and trade of Alexandria, leaving the same entirely to their disposition of it, in such manner as appears to them promises to yield the greatest good," was held void, in Wheeler v. Smith, 9 How. 55, 13 L. Ed. 44; the court remarking, in the course of the opinion, that:

"A trust is vested in the executors, but the beneficiaries of the trust are uncertain, and the mode of applying the bounty is indefinite."

Authorities are cited by counsel for interveners which are apparently opposed to the holding of these cases; but, when examined with discrimination, it will be found that they are not. Perin et al. v. Carey et al., 65 U. S. 465, 16 L. Ed. 701, and Jones v. Habersham, 107 U. S. 174, 2 Sup. Ct. 336, 27 L. Ed. 401, are fair illustrations of all. These two cases are based upon devises or bequests to charity, and it is a well-established principle of law that their validity is dependent upon the laws and the judicial interpretation thereof within the state where the lands lie if real property be the subject, or where the testator had his domicile if personal property. And the federal courts are controlled as well thereby. It was explicitly so held in the case last cited. That case arose in Georgia, and was declared to be subject to the laws of that state touching charitable uses, which are similar in purpose to the statute of 43 Elizabeth upon the subject. It is declared by such laws that:

"A court of chancery may, by approximation, effectuate the purpose (of the testator) in a manner most similar to that indicated by the testator."

In a sense the cy pres doctrine is made to apply in such a case. The trust to charity was therefore sustained by reason of the controlling force of the local law. But in the case of Wheeler v. Smith, supra, coming from Virginia, where neither the statute of 43 Elizabeth nor any similar statute obtains, the cy pres doctrine was not applied; the court saying that:

"In Virginia, charitable bequests stand upon the same footing as other trusts, and consequently, require the same certainty as to the objects of the trust and the mode of its administration."

While in the case of Perin et al. v. Carey et al., supra, the state of Ohio being without a statute of charities, it was held that the courts of equity in that state had adopted the doctrine founded upon the statute of 43 Elizabeth, and that the doctrine was controlling, both locally and in the federal courts. Such was the principle announced in the case of Vidal v. Girard's Executors, 2 How. 127, 11 L. Ed. 205.

It is a principle that in equity the absolute interest is vested in the cestui que trust, and the trustee is but an instrument for effectuating the trust, and, where executory, for carrying it into effect. Equity will not allow the trust to fail for want of a trustee. But, if there is no cestui que trust susceptible of identification, the trust, other than for charity, is void absolutely, and equity is powerless to aid it in any way.

There is also a distinction between executed and executory trusts; but it does not consist in the fact that one is completely wound out

and the other is in process of being carried into effect. It depends rather upon the manner in which the trust is declared. An "executed trust" is one wherein the limitations and conditions attending it are fully and perfectly declared. An "executory trust" is one where the limitations are imperfectly declared; the intent of the creator being expressed in general terms, leaving the manner in which his intent is to be carried into effect substantially in the discretion of the trustee. The distinction has been illustrated by the act of a testator, as follows:

"Has the testator been what is called, and very properly called, his own conveyancer? Has he left it to the court to make out from general expressions what his intention is, or has he so defined that intention that you have nothing to do but to take the limitations he has given to you and convert them into the legal estate?" Beach on Trusts & Trustees, § 59.

See, further, Nicoll v. Ogden et al., 29 Ill. 323, 385, 81 Am. Dec. 311; Neves v. Scott, 9 How. 196, 211, 13 L. Ed. 102.

When, therefore, counsel for cross-complainants urge that Congress has created an executory trust, with the railroad company as trustee, they must mean that there was left, through the want of precisely defined limitations, something of discretion in the trustee as to the manner in which the trust was to be carried into effect. If not this, it is perfectly plain that the actual settler is not vested with the equitable estate simply by the terms of the act. If he were so vested, there would be nothing left for the trustee to do but to convey, on receipt of the $2.50 per acre, and that would be an executed trust. But, even upon the theory of cross-complainants that the settler becomes a cestui que trust upon making settlement upon a tract of 160 acres of land and the tender of the price, there would be nothing left for the trustee to do but to convey the land. The trust would then be an executed one, and not executory. The question as to the nature of the trust, if one exists, is not material; but the discussion of it will serve to illumine the primary question touching the intendment of the settlers clause. If there is nothing of a discretionary character for the railroad company to do in the disposal of these lands, nothing to settle as to when it shall convey, or when or in what manner it will convey, or for what price, the act or grant executes itself, and the company is but an automaton, with nothing to do but to convey to actual settlers, whoever they may be, which would constitute a mere passive or dry trust, were it not that the trustee has a beneficial interest in the property.

Now, there is in this case no semblance of a charitable trust—not the remotest purpose manifest of bestowing any charitable gift or devise. Indeed, the "actual settlers" designated can claim nothing, nor any particular tract of the grant, as a charity. Nor do I understand that they found their demand upon any such claim. They are standing on the law as creating a trust, with themselves as beneficiaries. Could it be more uncertain who it was intended the beneficiaries were to be, pursuing the theory that the grant created a trust? True, actual settlers may be termed a class of individuals who have set up and established homes upon specific tracts of land; but this is a very large class, and the term is very broad. The bounty,

however, is not to the class as a whole, but to such actual settlers as may establish themselves upon some tract of this grant not exceeding 160 acres in area. There could be no actual settler until an actual habitation was established upon some specific parcel of this land. Logically, no one is a cestui que trust under the theory until and unless he becomes such a settler. This is a palpable demonstration of the uncertainty as to the beneficiary, for who, of the vast concourse of humanity, is going to come and claim the right and privilege of settling upon the land? Beyond this, the nature and quantity of interest is not specific or definite. The declaration of the law is—I call it a law because it is to be construed as a law as well as a grant or contract—that the grantee shall sell in quantities not greater than one quarter section to one person. If this be a maximum limitation, it is surely not a minimum limitation, and the grantee might sell to one purchaser less than one quarter section and be within the law; and so there is palpable uncertainty as to the amount of land each settler is entitled to demand under the supposed trust, he being the cestui que trust. It is clear to my mind that the theory of a trust must fail, because of uncertainty in these particulars, namely, as to the cestui que trust, and as to the quantity of interest he is entitled to receive.

Looking at the matter in all its phases, the act lacks the elements of a trust whereby the railroad company is constituted a trustee for the administration of the granted lands, in any specific quantities, for the benefit or use of any definite or certain beneficiaries.

In arriving at this conclusion, I have not overlooked the cases, such as Rice v. Railroad Company, 1 Black, 358, 17 L. Ed. 147; Mills County v. Railroad Companies, 107 U. S. 557, 2 Sup. Ct. 654, 27 L. Ed. 578; United States v. Des Moines, etc., Co., 142 U. S. 527, 12 Sup. Ct. 308, 35 L. Ed. 1099; and Ashuelot Nat. Bank v. City of Keene, 74 N. H. 148, 65 Atl. 826, 9 L. R. A. (N. S.) 758—cited and relied upon by counsel for cross-complainants.

The Rice Case was concerning a grant of land to the territory of Minnesota to aid in the construction of a railroad, and it was held that the territory took the land in trust, without any beneficial interest therein, for disposal, and application of the proceeds to a specified public improvement. There was no cestui que trust, and none could enforce the trust except the general government, being the grantor.

The Mills County Case involved the construction of the proviso to the second section of the swamp land act of September 28, 1850 (Act Sept. 28, 1850, c. 84, 9 Stat. 519), requiring that the proceeds of the lands shall be applied exclusively, as far as necessary, to the purpose of reclaiming the same by levees and drains, and it was held that it imposed an obligation, resting upon the good faith of the states. The state of Iowa granted its swamp lands to the respective counties in which they were situated. A conflicting claim arose between Mills county and the Burlington & Missouri River Railroad Company. In the litigation Mills county insisted that the lands in suit had been disposed of by the state contrary to the proviso above alluded to, and

it was not only considered that the state was accorded a discretion as to the manner of disposal of such lands, but it was further determined that as to whether the state had faithfully performed its duty under the act of Congress in the disposal of its swamp lands to the counties was a question between the United States and the state, and that the obligation imposed constituted neither a trust following the lands, nor a duty which private parties could enforce as against the state.

In the case of United States v. Des Moines, etc., Co., there was a grant to the territory of Iowa, to aid in the improvement of the Des Moines river, and, while the grant was not declared by the court to be a trust, it was so treated; the territory, afterward the state of Iowa, becoming the trustee to see that the purposes of the grant were properly executed. No cestui que trust was intended; but the grant was to the territory, to be appropriated by it to the promotion of a specific improvement.

In Ashuelot Nat. Bank v. City of Keene, the court construed the deed, with its accompanying contract, as a grant in trust rather than upon condition, considering all the terms of both instruments, in view of the circumstances under which they were executed. The transaction was, in effect, a conveyance for a charitable use. The city took no beneficial interest in the property, but took it upon trust, to devote the same to public use. The action was not by one claiming as a cestui que trust, but by the heirs of the grantor.

So it would seem that these authorities do not support the contention claimed for them.

[13] This brings us to the contention made on the part of the interveners, which is, that the grant is both a law and a contract, a contract as well as a law; that, being such, there is a standing and continuing offer, to which the grantee is a party, to whomsoever may desire to become an actual settler and to purchase a tract of the granted lands not exceeding 160 acres; and that any such person, by a declaration of his purpose and a tender of the purchase price, namely, $2.50 per acre, brings himself into relation to the contract, thus making himself a party thereto, and is entitled to the rights of a contracting party to enforce a conveyance to him from the grantee.

In this connection, it is strenuously urged that, by declaring his purpose to become an actual settler and tendering the purchase price, the intending purchaser acquires a vested right in the property, which not only the grantee but the government also is bound to regard, and of which he cannot be divested without his consent, thus entitling him in due course to a proper conveyance. The position is based upon a supposed analogy to the acquirement of vested rights against the government by pursuing the acts and regulations established for the acquirement of pre-emption and homestead claims to tracts of the public domain. It is therefore well to determine: First, whether the analogy exists; and, second, whether a vested right can be acquired in some other way.

It is well settled, by a uniform line of decisions, that a settler under the pre-emption statutes of Congress does not acquire a vested

right as against the general government to appropriate the lands for other purposes, until he has done all that the law requires him to do, including the payment of the purchase money, to entitle him to a patent. When he has performed all these acts, observed all the requirements of the law, and nothing remains to perfect his title but the issuance of a patent, he becomes the equitable owner of the land settled upon, and, being the equitable owner, he is said to have acquired a vested right, of which he cannot be divested even by the government, much less by private parties in any capacity.

One of the earlier cases upon the subject is Frisbie v. Whitney, 9 Wall. 187, 19 L. Ed. 668. It arose in the following manner: Certain supposed grants by the Mexican government to one Vallejo, comprising a large tract of land in the state of California, were declared void by the Supreme Court. The land thereupon became public domain of the United States. Many persons were at the time occupants of the land, claiming right and title through Vallejo. In order to protect these occupants, Congress, on March 3, 1863, passed an act (Act March 3, 1863, c. 116, 12 Stat. 808) for their benefit. Frisbie was an occupant and claimant under this act. Whitney attempted to enter upon the same land, and claimed settlement thereon. This was prior to the act of 1863. After his settlement he tendered to the land officers his declaration of intention to occupy and cultivate the land as a pre-emptioner, but was refused. The judgment of the court followed on these facts; Whitney claiming that he had thus acquired such a right or interest in the land as could not be divested by the government. After reference to the requirements of the pre-emption acts for acquiring public lands, the court said:

"When all these prerequisites are complied with, and the claimant has paid the price of the land, he is entitled to a certificate of entry from the register and receiver; and after a reasonable time, to enable the land officer to ascertain if there are superior claims, and if in other respects the claimant has made out his case, he is entitled to receive a patent, which for the first time invests him with the legal title to the land."

The court quotes as authoritative, and with approval, the opinion of Attorney General Bates on the subject, as follows:

"A mere entry upon land, with continued occupancy and improvement thereof, gives no vested interest in it. It may, however, give, under our national land system, a privilege of pre-emption. But this is only a privilege conferred on the settler to purchase land in preference to others. * * * His settlement protects him from intrusion or purchase by others, but confers no right against the government." 10 Opinions of the Attorney General, 57.

The next case following Frisbie v. Whitney is the Yosemite Valley Case, 15 Wall. 77, at page 87, 21 L. Ed. 82. Mr. Justice Field, speaking of the requirements necessary to the acquirement of title under the pre-emption laws, says:

"When these prerequisites (including the payment of the purchase price) have been complied with, the settler for the first time acquires a vested interest in the premises occupied by him, of which he cannot be subsequently deprived. * * * The United States by those acts enter into no contract with the settler, and incur no obligation to any one that the land occupied by him shall ever be put up for sale. They simply declare that, in case any of their lands are thrown open for sale, the privilege to purchase them in limited quantities,

at fixed prices, shall be first given to parties who have settled upon and improved them. The legislation thus adopted for the benefit of settlers was not intended to deprive Congress of the power to make any other disposition of the lands before they are offered for sale, or to appropriate them to any public use."

Without following the line of authorities further, it is sufficient to say that the doctrine has since been several times reaffirmed. Shepley v. Cowan, 91 U. S. 330, 23 L. Ed. 424; Atherton v. Fowler, 96 U. S. 513, 24 L. Ed. 732; Wirth v. Branson, 98 U. S. 118, 25 L. Ed. 86.

This as between the settler and the government.

As it relates to grants in aid of railroads and for internal improvements, there are numerous decisions determining when a pre-emption or homestead claim attaches, or at what period of time in the acquirement of such a claim the land has become appropriated, having in view the language of each particular act, denoting the exceptions from the grants. Thus in Kansas Pacific Railway Co. v. Dunmeyer, 113 U. S. 629, 5 Sup. Ct. 566, 28 L. Ed. 1122, it was held that the claim of homestead had attached when a homestead entry was made upon the land, and, having been made prior to the filing on the part of the railway company of its map of definite location, the land covered was excepted from the grant by the words:

"Not sold, reserved, or otherwise disposed of by the United States, and to which a pre-emption or homestead claim may not have attached."

A like ruling was had in Hastings, etc., Railroad Co. v. Whitney, 132 U. S. 357, 10 Sup. Ct. 112, 33 L. Ed. 363, where the exception was of lands to which "the right of pre-emption or homestead settlement has attached." What is meant by a homestead entry is there explained. It is not a simple entering into possession or occupation of the land, but three things must concur to constitute an entry on public lands: First, the applicant must make an affidavit setting forth the facts which entitle him to make such an entry; second, he must make a formal application; and, third, he must make payment of the money required. "When," says the court, "these three requisites are complied with, and the certificate of entry is executed and delivered to him, the entry is made—the land is entered." Act May 20, 1862, c. 75, 12 Stat. 392.

In Maddox v. Burnham, 156 U. S. 544, 15 Sup. Ct. 448, 39 L. Ed. 527, it was held that the mere occupation of public land, with a purpose at some subsequent time of entering it for a homestead, gave the party so occupying no rights against the railway company.

It is true that a man refused his right of entry by the officers of the local land office will not be deprived thereby of his priority in right. Ard v. Brandon, 156 U. S. 537, 15 Sup. Ct. 406, 39 L. Ed. 524. But the principle has no bearing upon the question as to what constitutes a valid homestead entry.

In Northern Pacific Railroad v. Colburn, 164 U. S. 383, 386, 17 Sup. Ct. 98, 99 (41 L. Ed. 479), the court says:

"But frequent decisions of this court have been to the effect that no pre-emption or homestead claim attaches to a tract until an entry in the local land office."

186 F.—58

And further, quoting from Lansdale v. Daniels, 100 U. S. 113, 116, 75 L. Ed. 587:

"Such a notice of claim or declaratory statement is indispensably necessary to give the claimant any standing as a pre-emptor; the rule being that his settlement alone is not sufficient for that purpose."

In Tarpey v. Madsen, 178 U. S. 215, 225, 20 Sup. Ct. 849, 853 (44 L. Ed. 1042), it was added:

. "And the acceptance of such declaratory statement, and noting the same on the books of the local land office, is the official recognition of the pre-emption claim."

So that it was finally adjudged that the question whether a homestead or pre-emption had attached as it respects the filing of a map of definite location must depend upon the record in the land office.

In line with the foregoing decisions, this court has held (Eastern Oregon Land Co. v. Brosnan [C. C.] 147 Fed. 807) that a mere settler, who had made no filing on the land under the land laws, was not an appropriator within the exception of the grant, but that, where such a settler was in occupancy under a pre-emption or homestead claim duly filed, there was an "appropriation."

These authorities illustrate and determine the point of time when rights are acquired by settlers, that give them superiority over grants made in aid of railroads and internal improvements, under the usual exceptions from the grants. Whenever it occurs that there has been an entry of a homestead, or a proper notation in the land office of a pre-emption application, so that there appears a record of the initiatory steps to obtain such a claim, then it may properly be said that the claimant acquires a vested right as against the person or corporation claiming under such grants, but not until then.

So much for vested rights in this relation.

As between contesting claimants of homestead or pre-emption rights, a still different rule obtains. The first in occupancy of the land, with a bona fide intention or purpose of appropriating the same under the laws and regulations providing therefor, has the better and superior right. As was said in Atherton v. Fowler, supra:

"During this preliminary period he had no vested right to the land; but, as we have elsewhere decided, he did thus acquire the right of preference in the purchase. That is to say, if he made the necessary settlement and improvement, and the necessary declaration in writing, no other person could buy the land until the period elapsed which the law gave him to pay the purchase money."

And again, in Tarpey v. Madsen, supra:

"So that any controversy between two occupants of a tract open to preemption and homestead entry is not determined by the mere time of the filing of the respective claims in the land office, but by the fact of prior occupancy."

In a sense the prior occupant has a vested right, but only as against another claiming under the same statutes. And so "vested right" is a relative term, depending for its acquirement upon the particular claim that is put forth.

I have thus developed the subject for present application; but, before coming to that, it will be instructive to examine another case con-

fidently relied upon by counsel for interveners. It is Jumbo Cattle Co. v. Bacon (Tex.) 17 S. W. 136. A statute of Texas, with its amendment, provided for the sale of state lands at 50 cents per acre to any responsible person who would make application therefor and survey the same. In pursuance thereof, parties made regular application to purchase certain state lands, caused survey to be made, paid the fees therefor, together with the fees for recording, and tendered the purchase price. Under this state of facts, it was determined that the applicants acquired a vested right in the land, and that their interest thus acquired was not affected by a subsequent act repealing the statute under which the applicants proceeded. In the course of the decision the court said:

"When there is an offer made by an act of the Legislature, which is accepted by an individual, there is a contract which it is not within the power of the state to impair. * * * The expenses of the surveys, in connection with the price to be paid to perfect the title, are a sufficient consideration to support the contract."

This case is truly illustrative. There must be an offer to sell on some terms, and there must be an acceptance of the offer on the terms proposed, before there can be a meeting of minds, or any contractual relations can arise. The government has granted certain lands to the railroad company under a provision that the grantee shall sell to "actual settlers." The grant, however, is not accompanied by an offer to sell. Surely the government makes no such offer. Being a law as well as a grant, the act directs that the grantee shall sell. But, suppose the grantee refuses to obey the law, is there, notwithstanding, an offer on its part to sell? Does the law make the offer for it? There might perhaps have been some grounds for so holding if the railroad company had been accorded no discretion in the matter, and was simply required to perform a mere ministerial service in executing deeds to such actual settlers as should come and pay it the maximum price of $2.50 per acre. But it has a discretion. It may sell in less than 160-acre tracts, and for less than $2.50 per acre. So who shall say that, by reason of the law alone, it has offered to sell in tracts of 160 acres, and for $2.50 per acre, so that any actual settler may purchase upon those terms. It has the right to sell upon those terms; but the law does not make any such offer for it. While the act is a law unto the grantee, it binds no one else. It is not an offer to sell to actual settlers. The general government withdrew these lands from the public domain, and from sale and settlement, under its administration, when it made the grant. Prior thereto the government's offer of sale was through the pre-emption, homestead, and other acts providing for the disposal of the public domain. No party could acquire any vested right as against the government, or as against railroad or other grantees, under exceptions favoring the settler, or as against adverse claimants, without a compliance with the acts and under the rules and regulations of the Land Department. The acts for the disposal of the public domain constitute standing offers of sale upon the terms designated, to any who are disposed to accept them and qualify themselves to become purchasers. But the accept-

ance consists in acceding to the terms of the offer, and no vested right can arise except by a compliance with the terms laid down.

For the due and orderly administration of the disposal of the public lands, through the pre-emption, homestead, and other acts according the privilege and right of purchase, regulations are established by the Land Department, and a code of rules adopted under authority of Congress, until a complete and thorough system of administration and judicatory has been established, by which to serve the demands of purchasers and claimants, and to determine and settle adverse interests as they arise. Experience has demonstrated the necessity for such a system of administration to subserve and preserve the interests and rights of purchasers. By the grant in question Congress has withdrawn a considerable body of the public domain from sale and disposal by the government, so that those lands are no longer offered under the pre-emption, homestead, or any other law of Congress unless it be under the act making the grant. But the grant, as we shall presently see, is one conveying title, so that the government is without further right or power of disposal. Congress has not attempted to regulate the sale of this large body of land in any way, but has simply declared that the grantee shall sell to "actual settlers." Having thus withdrawn these lands from the public domain, and from sale and disposal through the Land Department, and having granted them to the railroad company with a bare declaration that the grantee shall so sell the lands, without attempting in any way to prescribe the manner of sale, or to provide rules or regulations for the administration of the disposition of the grant, seems to me plainly to evidence an intendment that the grantee should itself administer the disposal of the grant, and should proceed about it in its own way and manner. As previously observed, a command to the company that it shall sell, or even an agreement to sell by the company with the government, cannot be construed in any way as an offer to third parties to sell. A breach of the law or obligation would entail its penalties as per the intendment of the law or contract; but the grantee would incur no liability to a person not a party to the compact.

It has been held that, where one party has paid money to another for the benefit of a third, or has paid a consideration for which a third party was to receive some benefit, the third party has a right of action directly against the party receiving the money or consideration. That rule can have no application here, because, if for no other reason, it is not known who the third party is. The land is to be disposed of to no specific person, but to actual settlers, in quantities not greater than 160 acres to each person—a great class of persons—and it was not intended that the bounty should be distributed among the entire class; no single third party can come forward and demand any specific tract of land from the company. This demonstrates the difficulty of selling to actual settlers without the adoption of some rule or regulation for determining who are actual settlers, and to test their good faith. In fact, in the administration of the sale of this grant, the grantee is given considerable discretion. It may require actual settlement upon the tract selected; it may require reasonable improvements; and it may

require residence for a reasonable time to insure good faith. It might regulate the payments, requiring cash in hand, or deferred payments; it might regulate the quantity of land to be sold to each person, not exceeding 160 acres to any one person; and it might regulate the price, not to exceed $2.50 per acre. Indeed, it has a reasonable discretion as to when it shall open up the lands to occupancy and settlement, so that the lands may be disposed of to its advantage, as well as to the advantage of the settlers. How can it be said, then, that Congress has made the offer of sale, to which the grantee has acceded, and therefore that any one, coming forward asserting himself as intending actual settlement, and tendering the price, concludes a bargain with the grantee for the purchase of 160 acres of land? Such was not the intendment or purpose of Congress, and such is not the effect of the grant. Nor is the person claiming to be a settler, who has gone upon the land and is in occupancy of the tract selected, in any better position. There can be no purchase, either by right of settlement or otherwise, until the grantee or its successor has offered the lands for settlement and sale.

[14] It is hardly to be questioned that the act of 1866 in its original cast contemplated a granting to the railroad company designated by the Legislature of the state of Oregon, of the entire fee to these lands, accompanied with only two conditions, namely, that assent to the act should be filed with the Secretary of the Interior within one year from its passage, and that the road should be completed within the time designated in section 6. There were to be no other limitations of the estate in any way, and, if the conditions mentioned were complied with, the railroad company would be vested absolutely with an unconditional title. This it could sell or dispose of as it saw fit, and in any way or manner that might seem best for its individual purposes. As the clause limiting sales to 160 acres to one person, etc., was not then in the minds of the Congress, the intendment of the original act, of course, could not have been the same as with the amendment added. Amendments change intendment. That is the very purpose for which they are made—to give new or modified expression to the will and purpose of the Legislature. Amendments are not only effective for adding a new purpose to the old act, but they may reach back and give new cast and intendment as well. The amendments becoming part of the act itself, the whole must be construed together, as the original act would have been construed as one, harmonizing any seeming repugnance or incongruity, if possible, and so expounding as to give effect to every part. Logically, therefore, the intendment of the entire act as amended would differ from the original just so much as it was the legislative purpose to change it.

It is earnestly and stoutly urged that, as the lands were granted avowedly for the purpose of aiding in the construction of the railroad, and to secure the safe and speedy transportation of the mails, munitions of war, etc., and it being specifically directed that such lands should be applied to the building of the road, the primary and paramount purpose of the grant was the construction of the road and telegraph line, and that the sale of the lands to settlers was meant to be

secondary, subordinate, and subservient thereto. The lands themselves could not well aid in the construction, or be applied to the building, unless they could be disposed of or mortgaged, and the proceeds arising therefrom put to use in meeting the expense incident to such construction or building. Therefore it is argued that there was conferred along with the grant the implied authority to sell the granted lands, or any portion thereof, and the right to mortgage the fee thereof for the purpose of obtaining the means with which to carry on the work, and that the provision relating to the sale of the lands to settlers, being subservient to the paramount purpose, was intended as a directive regulation only, and not binding upon the company either as a covenant or a condition.

Reliance is placed upon Platt v. Union Pacific R. R. Co., 99 U. S. 48, 25 L. Ed. 424, in support of this position. This case was concerning the Union Pacific grant, made by act of Congress of July 1, 1862, as amended by act of July 2, 1864 (Act July 2, 1864, c. 216, 13 Stat. 356). The grant there, as here, was for the purpose of aiding in the construction of a railroad, etc. but it contained a provision that:

"All such lands so granted * * * which shall not be sold or disposed of by said company within three years after the entire road shall have been completed, shall be subject to settlement and pre-emption like other lands, at a price not exceeding $1.25 per acre to be paid to said company."

The seventh section of the act required the road to be completed by the 1st day of July, 1874. The road was so completed, and patents to all the lands granted were directed to be issued to the company in November of that year. Long prior thereto, however, to wit, on April 16, 1867, the company executed a mortgage hypothecating all the lands granted to secure the payment of certain coupon bonds amounting to $10,400,000. The plaintiff in said cause filed his declaratory statement upon a quarter section of the land as a pre-emptor September 21, 1878; more than three years after the completion of the entire road, made proper proofs, and tendered the purchase money, and the question presented for consideration was whether he was entitled to such quarter section as against the railroad company. The question turned upon the single inquiry whether the execution of the mortgage was a disposal of the land, and it was decided that it was, so that the quarter section in question was not subject to pre-emption at the time of filing plaintiff's declaration thereon. On the argument, it seems to have been urged that the interpretation given by the court to the words "sold and disposed of" was repugnant to the governmental policy of guarding against monopolies of public lands by single holdings. Answering this, it was conceded by the court that Congress even then had that policy in view, when it declared that the lands not sold or disposed of within three years after the road was completed should be subject to settlement; but it was said that such policy "was manifestly subordinated to the higher object of having the road constructed, and constructed with the aid of the land grant." All this in support of the court's position that a mortgaging of the lands was tantamount to a disposal thereof, and that this particular quarter section had been disposed of within the intendment of the grant at the time it was at-

tempted to pre-empt it. That is to say, the paramount object of Congress being to secure a construction of the road, it was rather to be assumed that it intended to permit the granted lands to be disposed of by mortgage, thereby providing the necessary funds for construction. There was no intimation that the clause providing for settlement and pre-emption was inoperative in any way as to any lands that might remain unsold or undisposed of for three years after the road was completed. Quite the contrary was the conviction of the court, for it declares that:

"The construction gives full effect alike to the paramount and the subordinate purposes of the act."

The grant, without words of restriction or limitation of title, would unquestionably authorize the grantee to sell, mortgage, or otherwise dispose of lands comprised thereby, as it might see fit, for a person is entitled to do as he pleases with his own, so that he does no wanton injury to another. But, if the grant does carry with it a restriction or limitation, then it must needs be given effect accordingly. Such must have been the view of the court in the Platt Case, for it says, in further argument in support of its position as to the significance of the words "disposed of":

"No limitation was set to the quantity of land which the company might sell to single associations, or single persons. It was left at liberty to sell, if it could, to any land association or private purchaser, the entire body of the lands or any lesser quantity, regardless of the general legislative policy. * * * With that power no pre-emptor was authorized to interfere"—that is, if sold at any time within three years after the entire road was completed.

It is quite probable that the paramount purpose of Congress in making the grant in question was to secure the construction of the road, and we might well let it be so conceded. It by no means follows, however, that that purpose has rendered inoperative and nugatory for any effective use any succeeding clause in the act, or that it renders any the less effective any limitation that may have been reserved as to title, or any restriction that may have been imposed as to sale of the lands. That the grant was in aid of the road, and to be applied to the construction thereof, does not argue that the lands were to pass in absolute fee simple, with no restriction or limitation. If Congress had so desired, it could have granted but half the amount of lands that it did, or could have granted the even sections instead of the odd, or could have withheld any indemnity for lands previously settled upon, or otherwise disposed of. It might have granted an estate for years only in the lands, or the timber thereon, reserving the lands, as it did in fact reserve the mineral lands. And so, without question, it might have made the grant upon any valid condition that it desired to annex, be it precedent or subsequent, and yet the estate, whatsoever it was that was in reality granted, would go in aid of construction, and the grantee would be bound so to apply it. It would simply have to deal with the estate, whatever its quality or quantity, that it had been given for raising funds with which to meet the expenses of building. So the fact that lands were granted in aid of construction, and were required to be applied in building the road, is not antagonistic to the

idea of a condition subsequent attending the grant, if such was the purpose of Congress. Manifestly the fee simple absolute would have been a more valuable and available asset; but if Congress did not choose to grant such a bounty, believing that the lesser estate would be adequate for the purpose, that would end the controversy, and it is sufficient to find out the intendment of Congress in that relation.

In this connection, it should be noted that Congress fixed the price of government lands lying within the limits of the grant, being the even-numbered sections, at double the minimum price of public lands outside, and reduced the quantity of land to which the homestead settler was entitled to 80 acres. The act of thus regulating the price of government lands within the railroad limits was an incentive and inducement to the company to dispose of its lands to settlers also, and was in harmony with the provision later annexed by amendment requiring it to sell to actual settlers only, at a price not to exceed double the minimum, namely, $2.50 per acre, while it was left at liberty to sell for less if at any time it so desired. Without the amendment, however, and whatever may be its effect, the company was not restricted in any way as to the manner of its disposal of the grant. But the intendment of an amended act may be very different, as I have previously observed, from that which signalized the original.

It is worthy of remark in passing that the government not only granted the lands, but gave the right of way over such of the public lands as the road might pass through, together with all necessary grounds for stations, buildings, workshops, depots, machine shops, switches, etc., and so much of the timber on mineral lands as should be required to construct the road over said lands—not an inconsiderable bounty—and all in aid as well of the construction of the road and telegraph line.

The government was to receive a consideration for its grant, namely, the transportation of its mails, troops, munitions of war, etc. This in a purely private grant, where technical words appropriate to the creation of a condition subsequent are wanting, would evidence an intendment not to create such a condition. But where technical words are in fact employed, and the grant is by the government, being public in nature, other considerations apply, and these facts should be taken into account, along with all other matters attending the adoption of the act, in endeavoring to ascertain the intendment of Congress.

Patents were to be issued as the road was completed, section by section of 20 miles each, for the lands granted to the extent of and coterminous with the completed sections. This was another incident of the grant. The patents became simply evidentiary of title, while they operated as further assurances thereof. The grant—that is, the act of Congress making it—yet remained the railroad company's primary and essential muniment of title, to which reference should always be had for the quantity and quality of the estate granted and the terms and conditions attending it. The provisions for patenting the grant are usual to most grants in aid of railroad construction, and throw no particular light upon the purpose of Congress in limiting the sale to settlers only.

Congress reserved the right and authority to enter into possession of the road in case the railroad company should fail at any time to keep the same in repair and fit for use, and, after assuming control, to repair it as needed. To meet the expenses thereof, it was empowered to devote the income of the road thereto, or it might fix pecuniary responsibility not to exceed the value of the lands granted. The purpose of this provision is plain. It was to insure the upkeep of the road, so that its use would be at all times available to the United States for the transportation of mails and troops, munitions of war, etc. This enhances the consideration which the government received, and is continuously to receive for its bounty, and speaks favorably of an intendment to grant an absolute title, for the larger the consideration the greater one would assume would be the value of the thing given for it.

The requirement to operate the road throughout its two divisions without discrimination as to rates and time of service was simply meant to afford compensation either to the government or to the public for any damages sustained in this relation, and has no particular bearing upon the question in hand.

It was further required that the company should file its assent within one year, and complete the first section of 20 miles within two years (extended by the amendment of June 25, 1868, to 18 months after the passage of that act), completing the entire road on or before July 1, 1875 (extended by the amendment to July 1, 1880). These were conditions subsequent, rendering the act null and void in case of failure to comply with the requirements, and subjecting the grant to reversion to the government.

It is argued with much force that, having made such specific provisions for a forfeiture of the lands for nonobservance of these provisions, Congress, if intending to annex a condition subsequent by the provisions of the amendment of April 10, 1869, under consideration, would have been equally specific in language, so that there would be no doubt as to its real purpose. To this argument, there are reasons contra. The amendment was adopted at another and a later session of Congress, when Congress was addressing itself specifically to the one object, while reviving the grant, that of devoting the lands ultimately to use and acquirement by actual settlers.

The provision contained in the amendment of April 10, 1869, that nothing therein should impair any rights previously acquired by any railroad company under the original act, has been commented upon sufficiently heretofore, and its purpose expounded.

This epitome of the provisions of the act of 1866, with its amendments, will suffice for inference and deduction as it respects the intendment of Congress in annexing the actual settlers clause.

At the time of the adoption of the actual settlers clause as an amendment, it was, as we have seen, the firm policy of Congress to dispose of its public lands to settlers, while as yet it had not entirely abandoned the policy of making donations in the way of grants to railroads. The purpose of Congress in requiring railroad grants, as well as the public domain, to be disposed of to actual settlers, is aptly and strongly emphasized by the clause under consideration; and can any one doubt that it

designed to make its edict in that behalf effective? The debates in Congress while a like proviso was earlier under consideration show unmistakably what the individual members thought of it, and the course the legislation took, to my mind, indicates quite as clearly the intendment of Congress itself. It will be recalled that Mr. Lawrence, in moving an amendment to the Denver-Pacific Railroad bill, which is in effect the same as the one under consideration, in connection therewith proposed further that the Secretary of the Interior be authorized to prescribe rules for carrying the enactment into effect, while Mr. Logan purposed making the lands subject to entry at the government Land Office; the price thereof at the rate of $2.50 per acre to be deposited in the Treasury of the United States as a sinking fund for the redemption or purchase of the bonds of the company, so far as it was adequate. Congress, however, declined to incorporate either of these ideas into its legislation, but did adopt the Julian amendment in their stead; and this identical amendment was later incorporated in the act of July 25, 1866. The result was that the grantee company was liberated of all governmental control over the administration of the grant, and was left free to dispose of the lands in its own way, in pursuance of the terms of the amendment. This fact rather emphasizes than detracts from the obligation of the company to observe the letter of the law, and is in disparagement of the idea that it was to exercise a discretion only in the premises. It may have been, and presumably Congress was influenced by the thought, that the company had the discretion to dispose of these lands in less quantities than 160 acres, and at a price less than $2.50 per acre, if it should so desire. However this may be, the effect was to give such a discretion in that way. This was an advantage to the company, for it operated to enable it to dispose of the grant more expeditiously.

Along with this idea was another operating to the benefit of the railroad company. Congress, while pursuing its policy of disposing of the public domain to settlers, increased the price under pre-emption, and decreased the amount by half that the homesteader was entitled to take, thus conceding to the company equal advantage with the government, and even the privilege of underselling it. The legislation was, however, not without benefit to the government also, for it was assumed that the construction of the road would open up the lands to settlement and occupation along its course, through the increased facilities for transportation that would thus be afforded. It is quite contrary to the purpose of both Congress and the company itself to say that actual settlement was not in contemplation of the parties. While a considerable portion of the Willamette Valley was then occupied by early settlers under the old donation act, yet it was with keenest anticipation of the settlement and upbuilding of the territory along the line that the road was authorized and constructed. Mr. Julian's words were strongly expressive of the purpose of the amendment, as well as of the expectation of those concerned, when he said:

"This will avoid complete monopoly of the lands, as sanctioned by the old system of land grants, and at the same time devote to settlement and tillage the odd-numbered sections granted, while creating in this way established communities and a local businesss along the line of the road."

The amendment was in its nature a revival of the grant, Congress and the promoters of the company both believing that the grant had lapsed; and, as the original grant was of the fee, the revival was effective to restore it in fee, but with the provisions in question subjoined. This argues with conclusive force against the idea of a trust. Congress did not take the lands back and regrant them, but in effect revived the old grant with limitations. So that, taking into consideration the course of the legislation resulting in the adoption of this amendment, and viewing it in the light of contemporaneous conditions, it would seem that it was the firm purpose of Congress to impose upon the grantee a positive and mandatory obligation and duty to observe the behests of the amendment.

The amendment contains apt words of a condition subsequent, namely, "provided that," and "only." It does not contain a clause of re-entry. It is quite sufficient, as we have seen, if it contains the one without the other, if from the entire act the intendment to create a condition subsequent nevertheless appears. Indeed, neither words of condition nor a clause of re-entry is indispensable to the creation of a condition subsequent. It is yet sufficient if it otherwise appears that such was the purpose of Congress. In this relation, the act is to be construed as a law, which is the voice of command, not of privilege or discretion, and the grant itself is to be construed most strongly against the grantee and in favor of the government. The grant is a private one, and not by nature general and public, and the limitation placed upon the sale of the lands is in no way repugnant to the grant. These matters are to be considered along with all the provisions of the original act, as well as of the amendments, the analysis of which as it relates to the question in hand I have given. And upon the whole, giving efficacy to all the provisions of the grant, I conclude that the amendment in question imposed thereon a condition subsequent, for a breach of which on the part of the grantee company the lands would be subject to forfeiture to the United States. See Nichols v. Southern Oregon Co., supra, and Warrior River Coal & Land Co. v. Alabama State Land Co., supra.

Further than this, either this provision is purely a covenant, or, as is contended by defendants' counsel, a mere directive regulative covenant carrying with it no duty or obligation on the part of the grantee to do what the terms of the grant or the law, or the contract if so termed, plainly declares it shall do, depending entirely upon its own volition and discretion, or it is something more. As a covenant purely, the government has no such interest therein as will afford it any relief whatsoever, as it could lose nothing by maladministration of the grant. Was such the intendment of Congress, that the government should thus be left remediless, no matter how flagrant might be the violation of the terms of the provision? If so, the proviso might just as well have been omitted in toto, as it is thus rendered a dead letter, without force or effect, and with scarcely a purpose or design. It means nothing, and requires or compels nothing. In the case of Mills County v. Railroad Companies, supra, it is true the Supreme Court held, with relation to the swamp land grant as extended to the state of Iowa, that

it imposed an obligation and discretion, resting in the good faith of the state, as respects the application of such lands for the purposes designated in the grant. That, however, was a grant to the state, which had a purely public interest to subserve. I have been referred to no case where a purely private grant has been so construed, although in aid of the construction and maintenance of a public utility.

It is highly reasonable that Congress intended no such idle ceremony. Rather should we suppose that the proviso, annexed by specific amendment as it was, was designed to be a positive, efficient, and living condition, to be faithfully and punctiliously observed, with substantial and remedial consequences to follow a deliberate and willful infraction thereof. This could only be, as the provision does not create a trust, by entailing forfeiture for the infraction. I am not making this deduction ab inconvenienti, but because it is impossible to believe that Congress intended anything else. Leaving itself remediless upon the hypothesis of a covenant, it must have intended that the general government should have right of enforcement for noncompliance with the law by forfeiture of the grant.

It was the intendment of Congress that the railroad company should administer the grant in its own way, but that it should sell to actual settlers in quantities not greater than 160 acres to any one purchaser, and at a price not exceeding $2.50 per acre. It could sell in less quantities and for a less price. The mandate of the law is that the "lands granted * * * shall be sold." This imposed upon the grantee the obligation to dispose of the lands, for it was the purpose that all the lands along the line of the road, both the granted lands and the public domain, should be opened to occupancy and settlement. Senator Williams and others were of the view, as it respects the West Side, that "The lands granted are as open under the provisions of this bill to actual settlers as they are under the pre-emption laws of the country." While Senator Vickers maintained that the grant "was expressly upon the condition that the lands are to be sold to actual settlers."

I am of the opinion, however, while it was designed that the lands covered by the grant should be opened to settlement, and this was made incumbent and compulsory upon the railroad company, that until it was done, and the company offered the lands for sale, no one could acquire any vested right therein, because, as I believe, the administration of the grant in disposing of it to settlers was reposed wholly in the railroad company. No time is named when the lands shall be sold; but this does not detract from the obligation to sell—to put the land upon the market. The company was required to enter upon its administration of the grant under the act within a reasonable time, taking into consideration the attending circumstances and conditions, and for a violation of duty in this regard the grant would be subject to forfeiture.

[15] Possibly the company could mortgage the grant in its entirety; but it would necessarily be subject to the condition subsequent attending it, and the mortgagee could acquire no greater interest.

These considerations render it unnecessary to consider further the defendants' eighth point of contention.

[16] As it pertains to the West Side grant, or that of May 4, 1870, while the provision relating to actual settlers does not contain the same words indicative of a condition subsequent as the amendment to the East Side grant, the provisions of section 5 show very clearly the purpose of Congress. A sinking fund was there provided for, to consist of the net proceeds of the sales of the granted lands, which were to be set apart and appropriated, through a mortgage or deed of trust to two or more trustees, for the purchase from time to time, and the redemption at maturity, of the first mortgage construction bonds of the company, on the road, depots, stations, side tracks, and woodyards, not exceeding $30,000 per mile of road, payable in gold coin not longer than 30 years from date; and it was declared that no part of such fund should be applied to any other use until all of such bonds were purchased or redeemed and canceled. Thus it was contemplated that the lands were not to be hypothecated, with the road and its equipments, for raising funds generally, but were to be disposed of under the provisions of the settlers clause; the proceeds thereof going into the sinking fund, to be disposed of as above indicated. In this way, and in this way only, the lands were to be used in aid of the construction of the railroad and telegraph line. As Senator Williams said in the Senate:

"The entire object of this section is to make the grant insure the purpose contemplated by the bill, that is, to aid in the construction of the road, providing that the net proceeds of the land granted shall be invested and set apart to secure the bondholders who may advance money for its construction."

This does not comport with the idea that the grant was of the entire fee, without condition, entitling the company to sell at any price, and to receive the proceeds to its own use, whether above or below the price fixed by the act. It does not, therefore, seem reasonable that Congress designed that these provisions should be merely directive and regulative, to be observed or not within the discretion of the grantee.

Under the theory of counsel for defendants that the settlers clause constitutes "a mere directive covenant," the government would logically, and quite naturally, possess a nominal interest only in the grant, and hence could not enforce the obligation. The argument, while unsound in my opinion, affords the most cogent reason for inducing the belief that Congress had no such purpose in view. Upon the other hand, it intended that the legislation should be effective, and, in view of the rules of construction which have been previously discussed, the known policy of Congress relative to the disposition of the public domain, and the attending conditions, I am firmly impressed that it was the intendment of Congress to impose a condition subsequent by the adoption of the actual settlers clause in this act, as well as by the April 10, 1869, amendment to the act of July 25, 1866.

We next come to the question urged that the suit cannot be maintained as one to enforce forfeiture nor to quiet title, because (1) the government has not declared forfeiture; (2) the fact of forfeiture has not been adjudicated by a court of law; and (3) the defendant railroad company holds the legal title and possession.

It is not, nor can it be, claimed that the government has not the same

rights and remedies accorded to a private person for a forfeiture of a grant for good cause existing. Atlantic & Pacific Railroad v. Mingus, 165 U. S. 413, 17 Sup. Ct. 348, 41 L. Ed. 770. The essential and particular contention of counsel for defendants is that they are entitled to a common-law proceeding in the determination as to forfeiture, and that this contemplates a trial by jury and not a proceeding in equity. Further, that equity is without jurisdiction to enforce a forfeiture, nor would it exercise such jurisdiction.

It is wholly unnecessary that I trace the history of office found and determine with nicety its common-law purposes, as the decisions of the Supreme Court have dealt with the subject by no uncertain deduction, and but slight reference need be made to authorities beyond these decisions. One thing is certain, that the jury there summoned, and before whom the issues were ascertained and determined, was not the common-law jury before whom a citizen has right in law and under Magna Charta, and under the Constitution of this government, to demand trial where his liberties or his rights, whether of person or property, are drawn in question. It has no relation to the great and long-revered right of trial by jury. Blackstone's definition of "inquisition" or "office found" proves this. It is:

"An inquiry made by the king's officer, his sheriff, coroner, or escheator, virtute officii, or by writ to them sent for that purpose, or by commissioners specially appointed, concerning any matter that entitles the king to the possession of lands or tenements, goods or chattels. This is done by a jury of no determinate number, being either twelve, or less, or more. * * * These inquests of office were devised by law, as an authentic means to give the king his right by solemn matter of record; without which he, in general, can neither take nor part from anything. For," continues the author, "it is a part of the liberties of England, and greatly for the safety of the subject, that the king may not enter upon or seize any man's possessions upon bare surmises without the intervention of a jury." 3 Blackstone, 258, 259.

It was a procedure peculiarly adapted for the king's use, and the important thing about it was that a record might be made and entered whereon the king could base his right to possess himself of the lands, goods, and chattels of his subject; and, as it respects lands, the office found put him into immediate possession, without the necessity of a formal re-entry. Although its frequent use was for the determination of attainder, escheats, and breaches of conditions annexed to grants, and the like, the record was not conclusive, and the subject was yet entitled to a trial suitable at common law for the final determination of his rights. A good illustration is found in escheats, and the procedure is thus stated by Mr. Justice Gray, in Hamilton v. Brown, 161 U. S. 256, 263, 16 Sup. Ct. 585, 587 (40 L. Ed. 691):

"The usual form of proceeding for this purpose was by an inquisition or inquest of office before a jury, which was had upon a commission out of the Court of Chancery, but was really a proceeding at common law; and, if it resulted in favor of the king, then, by virtue of ancient statutes, any one claiming title in the lands might, by leave of that court, file a traverse, in the nature of a plea or defense to the king's claim, and not in the nature of an original suit. * * * The inquest of office was a proceeding in rem; when there was a proper office found for the king, that was notice to all persons who had claims to come in and assert them; and, until so traversed, it was conclusive in the king's favor."

In this country, however, while the government may invoke the proceeding by nature of inquisition or office found for declaring forfeiture and establishing re-entry, it is not necessary to do so. The same object may be as adequately accomplished by legislative declaration. In one of the earlier adjudications upon the subject of forfeiture in this country (United States v. Repentigny, 5 Wall. 211, 267, 18 L. Ed. 627), the court says:

"We agree that, before a forfeiture or reunion with the public domain could take place, a judicial inquiry should be instituted, or, in the technical language of the common law, office found, or its legal equivalent. A legislative act, directing the possession and appropriation of the land, is equivalent to office found. The mode of asserting or of assuming the forfeited grant is subject to the legislative authority of the government. It may be after judicial investigation, or by taking possession directly, under the authority of the government, without these preliminary proceedings."

In a subsequent case it was declared that:

"Actual entry or office found is not necessary to enable the government to take advantage of a condition broken." McMicken v. United States, 97 U. S. 204, 217, 24 L. Ed. 947.

If a condition subsequent be broken, the circumstance does not, ipso facto, produce a reverter. The estate continues, notwithstanding, until proper and adequate steps be taken to consummate the forfeiture. Where, however, the grant is a public one, "the remedy," says Mr. Justice Brown, in Atlantic & Pacific Railroad v. Mingus, 165 U. S. 413, 431, 17 Sup. Ct. 348, 352 (41 L. Ed. 770), "is by an inquest of office or office found, a judicial proceeding but little used in this country, or by a legislative act directing the possession and appropriation of the land." After a discussion of the authorities in substantiation of the position, he concludes as follows:

"These cases are not put upon the ground that the United States reserved the right to declare a forfeiture, or even provided expressly for a reversion of title in case of a breach, but upon the general ground that the government was vested with the same right as a private grantor, upon breach of a condition subsequent, though such right was, from the necessities of the case, to be exercised in a somewhat different manner, viz., by legislative act instead of re-entry.

"But, while we think the practice of forfeiting by legislative act is too well settled to be now disturbed, we do not wish to be understood as saying that this power may be arbitrarily exercised, or that the grantee may not set up in defense any facts which he might lay before a jury in a judicial inquisition. It would comport neither with the dignity of the government, nor with the constitutional rights of the grantee, to hold that the government by an arbitrary act might devest the latter of his title when there had been no breach of the conditions subsequent, or when the government itself had been manifestly in default in the performance of its stipulations. The inquiry in each case is a judicial one, whether there has been, upon either side, a failure to perform, and it makes but little practical difference whether such inquiry precedes or follows the re-entry or act of forfeiture."

In a later case (New York Indians v. United States, 170 U. S. 1, 24, 18 Sup. Ct. 531, 537 [42 L. Ed. 1165]) the same eminent jurist says:

"A distinction is drawn by the authorities between the case of a private grantor, who may re-enter in the case of the breach of a condition subsequent, and the government, which can only repossess itself of lands by legislative or judicial action."

In Columbia Valley R. Co. v. Portland & S. Ry. Co., 162 Fed. 603, 606, 89 C. C. A. 361, 364, the Circuit Court of Appeals for the Ninth Circuit, speaking through Gilbert, Circuit Judge, of the purpose of legislative action, says:

"It is the 'legislative assertion of ownership of the property for breach of condition.' It is itself the entry of the grantor for condition broken."

See, further, Schulenberg v. Harriman, 21 Wall. 44, 63, 22 L. Ed. 551; Farnsworth et al. v. Minn. & Pac. R. R. Co., 92 U. S. 49, 66, 23 L. Ed. 530; McMicken v. United States, 97 U. S. 204, 217, 24 L. Ed. 947; Van Wyck v. Knevals, 106 U. S. 360, 368, 1 Sup. Ct. 336, 27 L. Ed. 201; Bybee v. Oregon & California R. Co., 139 U. S. 663, 674, 11 Sup. Ct. 641, 35 L. Ed. 305; United States v. Tennessee & Coosa R., 176 U. S. 242, 256, 20 Sup. Ct. 370, 44 L. Ed. 452; United States v. Northern Pacific Ry. Co., 177 U. S. 435, 441, 20 Sup. Ct. 706, 44 L. Ed. 836.

Office found for the king put him into immediate possession, without the necessity of a formal entry. So it seems in case of a legislative declaration of forfeiture for breach of condition subsequent, "It is itself the entry of the grantor." But, notwithstanding the entry, whether through office found or by legislative edict, the grantee is by no means precluded. It may be that it has the effect to change the manner of further procedure by putting the grantor into possession, so that it would have to proceed in equity to quiet title, rather than by action in ejectment; but, the grantee resisting, it needs yet the adjudication of a court of competent jurisdiction to terminate the controversy as to the right of forfeiture. The legislative edict determines no fact, except that it is an assertion of an election to re-enter for breach, and adjudicates nothing.

[17] Now, the government not having re-entered for breach of condition subsequent, it is urged that the defendants are entitled to a jury trial as to the fact of breach and forfeiture, and that equity will not entertain cognizance to enforce a forfeiture. Further than this, that equity is without jurisdiction to determine the cause, because the government has an adequate remedy at law, by ejectment, for possession.

Answering the first proposition, it is quite true that the right to have controverted questions of fact, in common-law causes, decided by a jury remains, but it is none the less true that matters cognizable in equity may be and generally are tried without the interposition of a jury. North Pa. Coal Co. v. Snowden, 42 Pa. 488, 492, 82 Am. Dec. 530.

And I see no reason why, if equitable jurisdiction is called into requisition upon some well-established equitable ground, the court may not try the fact of breach and forfeiture as well as any other fact in the case. We have seen that the jury trial incident to inquisition or office found is not the common-law jury trial preserved by Magna Charta and the Constitution of this government. If equity has jurisdiction to entertain the suit at bar, it has jurisdiction as well to determine whether breach has been suffered which entails the forfeiture by election of the government.

There can be no quarrel as to the proposition that the distinction between actions at law and suits in equity is rigidly maintained in the federal courts. Anglo-American Land, M. & A. Co. v. Lombard, 132 Fed. 721, 731, 68 C. C. A. 89.

It is quite strongly stated by many of the authorities that equity will not interpose its jurisdiction to enforce either a penalty or a forfeiture, and such may be said to be the general rule. Some of the expressions to be found are as follows:

"It is a universal rule in equity never to enforce either a penalty or a forfeiture. Therefore courts of equity will never aid in the devesting of an estate for a breach of a covenant on a condition subsequent, although they will often interfere to prevent the devesting of an estate for a breach of a covenant or condition." Story's Eq. Jur. (13th Ed.) § 1319.

"It is a well-settled and familiar doctrine that a court of equity will not interfere on behalf of the party entitled thereto, and enforce a forfeiture, but will leave him to his legal remedies, if any, even though the case might be one in which no equitable relief would be given to the defaulting party against the forfeiture." Pomeroy's Eq. Jur. (3d Ed.) § 459.

"Equity never, under any circumstances, lends its aid to enforce a forfeiture or penalty, or anything in the nature of either." Marshall v. Vicksburg, 15 Wall. 146, 149, 21 L. Ed. 121.

"Equity abhors forfeitures, and will not lend its aid to enforce them." Jones v. Guaranty & Indemnity Co., 101 U. S. 622, 628, 25 L. Ed. 1030.

See, also, Craig v. Hukill, 37 W. Va. 520, 16 S. E. 363; M. & C. R. R. Co. v. Neighbors, 51 Miss. 412.

In the last case cited it is further said:

"Nor will the court be induced to depart from its uniform course, and take cognizance of that question because the jurisdiction is sought on the ground of removal of clouds from the title; for the right of the complainants to a dispersion of the cloud is dependent upon a favorable adjudication of the first proposition, viz., that they are owners of the estate, by reason of a breach of the condition."

Yet, notwithstanding these strong statements, there is in the rule a flexibility which the Supreme Court has recognized, for it says, in Henderson v. Carbondale Coal & Coke Co., 140 U. S. 25, 33, 11 Sup. Ct. 691, 694 (35 L. Ed. 332):

"Equity always leans against them (forfeitures), and only decrees in their favor when there is full, clear, and strict proof of a legal right thereto."

In the case of Brewster v. Lanyon Zinc Co., 140 Fed. 801, 72 C. C. A. 213, determined in the Court of Appeals, Eighth Circuit, which was a suit in equity to establish as matter of record the forfeiture of an oil and gas lease, and to cancel the same as a cloud upon complainant's title, in an exhaustive and very able opinion rendered by Mr. Justice Van Devanter, it was declared that:

"The better view is that the rule is not absolute or inflexible, any more than is every forfeiture harsh and oppressive; that its influence and operation do not extend beyond the reasons which underlie it; and that in cases, otherwise properly cognizable in equity, there is no insuperable objection to the enforcement of a forfeiture when that is more consonant with the principles of right, justice, and morality than to withhold equitable relief."

In Westbrook v. Schmaus, 51 Kan. 558, 33 Pac. 306, the court entertained a suit to quiet title, where forfeiture was declared proper;

186 F.—59

and in Edwards v. Iola Gas Co., 65 Kan. 362, 69 Pac. 350, the court recognized the principle. So in Brown v. Vandergrift, 80 Pa. 142, 148, which was for the forfeiture of an oil lease, the court said:

"In a case like this equity follows the law, and will enforce the covenant of forfeiture, as essential to do justice. It is true as a general statement that equity abhors a forfeiture; but this is when it works a loss that is contrary to equity, not when it works equity and protects the landowner against the indifference and laches of the lessee and prevents a great mischief."

See, also, Glocke v. Glocke, 113 Wis. 303, 89 N. W. 118, 57 L. R. A. 458.

As said by Story, Eq. Jur. § 439:

"The beautiful character or pervading excellence, if one may so say, of equity jurisprudence, is that it varies its adjustments and proportions so as to meet the very form and pressure of each particular case in all its complex habitudes."

The Supreme Court has announced practically the same rule. In Farnsworth et al. v. Minn. & Pac. R. R. Co., 92 U. S. 49, 68, 23 L. Ed. 530, that court says:

"But it is said that provisions for forfeiture are regarded with disfavor and construed with strictness, and that courts of equity will lean against their enforcement. This, as a general rule, is true when applied to cases of contract, and the forfeiture relates to a matter admitting of compensation or restoration; but there can be no leaning of the court against a forfeiture which is intended to secure the construction of a work, in which the public is interested, where compensation cannot be made for the default of the party, nor where the forfeiture is imposed by positive law."

A little later the court quotes from Lord Macclesfield, in Peachy v. Duke of Somerset, 1 Strange, as follows:

"Cases of agreement and conditions of the party and of the laws are certainly to be distinguished. You can never say that the law has determined hardly; but you may that the party has made a hard bargain."

See, also, Chandler v. Crawford, 7 Ala. 506; Lafayette County v. Hall, 70 Miss. 678, 13 South. 39.

Beyond this, the federal courts have entertained jurisdiction in equity to forfeit land grants. United States v. Dalles Military Road Co., 140 U. S. 599, 11 Sup. Ct. 988, 35 L. Ed. 560; United States v. California, etc., Land Co., 148 U. S. 31, 13 Sup. Ct. 458, 37 L. Ed. 354; United States v. Oregon, etc., Railroad, 164 U. S. 526, 17 Sup. Ct. 165, 41 L. Ed. 541; United States v. Tennessee & Coosa R., 176 U. S. 242, 20 Sup. Ct. 370, 44 L. Ed. 452.

In the case cited next to the last the statement shows that it was instituted by bill to quiet title to about 90,000 acres of land in Oregon; and in the last-cited that the suit was brought "to forfeit a land grant made to the state of Alabama in aid of the construction of a railroad."

If it be said as to these cases that the government, by legislative declaration through acts of Congress, had forfeited the grant to all lands lying opposite the unconstructed portions of the roads, whether wagon roads or railroads, and therefore had resumed title and with it possession, so that the government was in a position, by being in possession, to interpose its relief by quieting title or removing a cloud, it may be answered that the grantee's possession was scarcely more than

fiction of law, if indeed the government was not in possession prior to the declaration of forfeiture.

[18] But without this, and conceding that the government is not in possession of the lands in controversy here, it is scarcely to be argued that the railroad company has possession other than such as may follow any grant. The company is not in absolute or actual possession. It has not planted its feet upon the soil in what is termed "pedis possessio." The lands in the main are wild and unoccupied, and are such that with reference to them the government may maintain a suit to quiet the title thereto, or to remove a cloud affecting them injuriously to the government. The bill of complaint shows quite sufficient for this.

Section 516 of the statutes of Oregon (B. & C. Comp.) provides as follows:

"Any person claiming an interest or estate in real estate not in the actual possession of another may maintain a suit in equity against another who claims an interest or estate therein adverse to him, for the purpose of determing such conflicting or adverse claims, interests, or estates."

Under the construction given to the statute by the state Supreme Court, if the plaintiff be not himself in possession, he must allege and prove that the property is not in the possession of another; otherwise he will be relegated to a court of law, where he has an adequate remedy by action in ejectment. Moore v. Shofner, 40 Or. 488, 492, 67 Pac. 511. And the possession that another holds to deprive the plaintiff of his suit must be actual as distinguished from constructive possession; the latter being such as follows the delivery of a deed merely. O'Hara v. Parker, 27 Or. 156, 167, 39 Pac. 1004.

The equitable relief afforded by state statutes of this nature might be availed of in the federal courts if they do not go to the extent of depriving the defendant of his right of trial by jury. If, however, plaintiff has an adequate remedy at law, he is compelled to resort to the law forum for his relief. Without a statute, bills quia timet, or to remove cloud from a legal title, cannot be brought by one not in possession, because the law provides a remedy by ejectment, which is plain, adequate, and complete. United States v. Wilson, 118 U. S. 86, 89, 6 Sup. Ct. 991, 30 L. Ed. 110.

In Holland v. Challen, 110 U. S. 15, 3 Sup. Ct. 495, 28 L. Ed. 52, the Supreme Court sustained a suit to quiet title under a statute that permitted the same to be instituted by any person, "whether in actual possession or not"; the subject of the suit being "unoccupied, wild, and uncultivated land."

In a later case (Wehrman v. Conklin, 155 U. S. 314, 15 Sup. Ct. 129, 39 L. Ed. 167), the court, having under consideration an Iowa statute which purported to enlarge the jurisdiction of equity to quiet title, held that such enlarged jurisdiction, if sought to be availed of in a federal court sitting within the state, could only be exercised subject to the constitutional provision entitling parties to trial by jury, and to the provision in R. S. § 723 (U. S. Comp. St. 1901, p. 583), prohibiting suits in equity when a plain, complete, and adequate remedy at law exists. But the principle announced in the case of Holland v. Challen was not disturbed, where neither party was in possession; the subject

of the suit being wild and uninhabited land. So that the Oregon statute does not go beyond the principle, adhered to in the federal courts, that the suit will not lie if the plaintiff has a complete and adequate remedy at law.

Further discussion of the subject will be found in Frost v. Spitley, 121 U. S. 552, 7 Sup. Ct. 1129, 30 L. Ed. 1010, and Whitehead v. Shattuck, 138 U. S. 146, 11 Sup. Ct. 276, 34 L. Ed. 873.

The remedy at law which will suffice to deprive a court of equity of jurisdiction must be as "certain, prompt, and efficient to the ends of justice as the remedy in equity." Kilbourn v. Sunderland, 130 U. S. 505, 514, 9 Sup. Ct. 594, 32 L. Ed. 1005; Gormley v. Clark, 134 U. S. 338, 349, 10 Sup. Ct. 554, 33 L. Ed. 909; Davis v. Wakelee, 156 U. S. 680, 688, 15 Sup. Ct. 555, 39 L. Ed. 578.

The remedy sought here includes the cancellation of a number of patents, as well as the determination of the question of forfeiture by the railroad company, and it must be conceded that the remedy at law is not as complete and adequate as in equity.

This brings us to the authority given by Congress for the institution of this suit. The Attorney General was "authorized and directed to institute and prosecute any and all suits in equity, actions at law, and other proceedings which he may deem adequate and appropriate to enforce any and all rights and remedies of the United States of America in any manner arising or growing out of or pertaining to" the acts in question granting lands, etc., "and in and by any and all such suits, actions, or proceedings, * * * in such manner as he shall deem appropriate, assert all rights and remedies existing in favor of the United States relating to the subject of such suits, actions, and proceedings, including the claim on behalf of the United States that the lands granted by each of said acts, respectively, or any part thereof, have been and are forfeited to the United States by reason of any breaches or violations of any of the terms or conditions of either or any of said acts which may be alleged and established in any such suits, actions, or proceedings; it not being intended hereby to determine the right of the United States to any such forfeiture or forfeitures, but it being intended to fully authorize the Attorney General in and by such suits, actions, or proceedings to assert on behalf of the United States and the court or courts before which such suits, actions, or proceedings may be instituted or pending to entertain, consider, and adjudicate the claim and right of the United States to such forfeiture or forfeitures, and if found to enforce the same."

It is plain that Congress did not, by the resolution, declare any of the lands in suit forfeited. It disclaimed any intention of so doing. But it is equally plain that it did authorize the Attorney General to institute such suit, action, or proceeding as he might deem appropriate to determine the vital question as to whether a forfeiture had been incurred. That is a question that necessarily would have to be litigated in an appropriate proceeding in any event, whether Congress declared a forfeiture in the first instance or not; the railroad company resisting. The declaration of forfeiture does not make it so in fact; and, if made contrary to the fact of forfeiture, it could not stand. Otherwise, it would be the most objectionable kind of taking of prop-

erty without due process of law. The declaration might be effective as a resumption of the grant, and therefore tantamount to a re-entry, so that a suit must recognize the relative positions of the parties as it respects possession; that is to say, that the government is in possession and the railroad company out. But this rests upon a fiction; no such transposition of possession has taken place in fact. However, an election on the part of the government to forfeit, and thus to resume its grant, may be signified by the bringing of an action or suit for the purpose. The language of Mr. Justice Harlan, in Schlesinger v. Kansas City, etc., Railway Co., 152 U. S. 444, 453, 14 Sup. Ct. 647, 651 (38 L. Ed. 507), is pertinent:

"In the case of a public grant, the right of the government to repossess itself of the estate granted may be asserted through judicial proceedings, or by some legislative act showing an assertion of ownership on account of the breach of the condition upon which the original grant was made."

In Ruch v. Rock Island, 97 U. S. 693, 697, 24 L. Ed. 1101, it is said:

"Bringing suit for the premises by the proper party is sufficient to authorize a recovery, without actual entry or a previous demand of possession."

See, also, Cowell v. Springs Company, 100 U. S. 55, 25 L. Ed. 547; Union Pac. Ry. Co. v. Cook, 98 Fed. 281, 284, 39 C. C. A. 86; Cornelius v. Ivins, 26 N. J. Law, 376.

True, these cases arose in ejectment, and were between private parties. But suppose ejectment had been brought here, the parties being so situated as to possession that it was proper, could there be any question that the institution of the action was sufficient as an election to forfeit the grant and to resume possession on that ground? So it is that, the plaintiff having its remedy in equity, the bringing of the suit is tantamount to an election to forfeit, and to resume possession on account thereof.

The real question, as has been previously indicated, is whether any forfeiture has been incurred for breach of condition subsequent, and that is for judicial cognizance, and for judicial inquiry and determination. As said by Mr. Justice Brown in Atlantic & Pacific Railroad v. Mingus, supra:

"The inquiry in each case is a judicial one, whether there has been, upon either side, a failure to perform, and it makes but little practical difference whether such inquiry precedes or follows the re-entry or act of forfeiture."

In the present case, the judicial inquiry simply precedes the act of re-entry or forfeiture, and its cardinal purpose is to determine the fact of forfeiture. Further disposition of the property will follow the adjudication.

While Congress has not declared a forfeiture leaving the judicial inquiry to follow, it has clothed the Attorney General with ample authority to institute a suit for determining whether forfeiture has been incurred or not, and, the facts being such that equity may entertain jurisdiction of the cause, there remains no reason why it should not be maintained.

In view of these considerations, the demurrer to the bill of complaint must be overruled, and the demurrers to the cross-complaint and bills of intervention will be sustained, and it is so ordered.